**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JAYLIMAR NATAL-LUGO, et al. | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No.:  20-CV-11979-GAO |
| | : | |
| CITY OF FALL RIVER, et al., | : | |
|     Defendants. | : | |
| | : | |

**DEFENDANT CITY OF FALL RIVER'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

This is a civil rights action presented in three parts.  First, the two co-representatives of

the estate of Larry Ruiz-Barreto bring claims arising out of the fatal shooting of Ruiz-Barreto on

November 12, 2017 by a member of the Fall River Police Department, defendant Nicholas Hoar.

The shooting, they say, was an unreasonable use of deadly force because, at the time of the

shooting, Ruiz-Barreto presented with no threat to warrant shots being fired at him.  Second, five

individuals, friends and family members of Ruiz-Barreto, advance claims grounded in what

happened at a Fall River hospital in the early morning hours of November 13, 2017, after the

officer-involved shooting.  While gathered at the hospital, these individuals close to Ruiz-Barreto

were informed of his passing and the resultant emotional upset led to a cascade of actions that

featured individuals engaging in destructive conduct toward hospital property and the fearful

scattering of hospital staff attempting to flee the danger posed.  Through these two phases of

perceived grievance, the plaintiffs have brought an assortment of federal and state causes of

action against more than a dozen individual defendants who the plaintiffs say were direct

participants in these unlawful events, as well as more than two dozen John Doe defendants.  *See*

1

*generally* Second Am. Compl., Docket No. 78.

The defendants implicated in those aspects of the plaintiffs' theories separately are moving for summary judgment and the record and arguments relating to those defendants will be left for that separate space of consideration.[1]  This piece of motion practice on behalf of the City involves issues of a different flavor as, in part three of their narrative, the plaintiffs say that all of their harms, from the unlawful shooting to the false arrests and unreasonable force during the seizures also produce responsibility of constitutional dimension for the then-acting Chief of Police, on a supervisory theory of liability, and for the City based upon the principles of *Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  Putting to the side the claims against defendant Albert Dupere, which are addressed in a separate motion, the plaintiffs' attempt to seek to impose municipal liability is more than the summary judgment record cast against the relevant legal principles can bear.  The City is entitled to the entry of summary judgment in its favor on the *Monell* theory, which is a theory that appears to be repeated for some reason within the pleading, as well as for those other claims that seem to include the City but that can be dispatched easily because they represent causes of action that the law says cannot be pursued against a municipality.

II.    **THE CONSTELLATION OF CLAIMS CONCERNING THE CITY**

The operative second amended complaint contains a total of sixteen causes of action, some containing multiple subdivisions.  *See* Docket No. 78 at 21-35.  With a level best review of

---

[1] This is with the proviso that, because a municipality only may be subject to potential *Monell* liability upon a demonstration that an employee committed an underlying constitutional violation, if the Court determines no such constitutional violation occurred here, the *Monell* theory may go no further.  *See Doe v. City of Boston*, 145 F.4th 142, 156 (1st Cir. 2025); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) (noting that if a person did not suffer a constitutional injury based on the actions of an individual police officer, an agency regulation that might have unauthorized unlawful force "is quite beside the point[]").

the pleading, the second amended complaint seems to be structured with:  (1) a section devoted to the claims brought by the representatives of the estate of Larry Ruiz-Barreto, beginning on page twenty-one and extending to page twenty-eight, featuring Counts I-VII; (2) a section for the claims of the arrestees from the hospital—Demix Ruiz-Hernandez, Leslie Lugo, Jonathan Ruiz-Hernandez, Miguel Sanchez and Jose Ruiz-Hernandez—that begins on page twenty-nine and continues through page thirty-one, with Counts VIII-XIV there included; and, (3) claims of "ALL PLAINTIFF'S [sic]" against the City of Fall River asserting *Monell* liability and negligence.  *See* Docket No. 78 at 31-35 (Counts XV and XVI).[2]

A fair reading of the complaint suggests that several claims only implicate defendant Nicholas Hoar, namely:  (1) Count I-Parts B, C, D and E; (2) Count II;[3] (3) Count IV;[4] (4) Count V; (5) Count VI;[5] and (6) Count VII.  *See* Docket No. 78 at 22-28.  Additionally, Counts III and IX, both civil rights conspiracy causes of action, are directed only at the defendant police officer and John Does, which reasonably may be understood as excluding the City.  *See* Docket No. 78 at 27 (Count III); *see also* Docket No. 78 at 30 (Count IX).

What then is left for the City is:  (1) a § 1983 claim by the decedent's estate; *see* Docket

---

[2] It is acknowledged that this conceptualization of the pleading creates some degree of duplication in that, if Count XV is, at it claims to be, is a *Monell* claim against the City of Fall River, the City already appears named as a defendant in earlier 42 U.S.C. § 1983 claims associated with the shooting; *see* Docket No. 78 at 21-22 (Count I-Part A); and the hospital arrests.  *See* Docket No. 78 at 29-30 (Count VIII).  The identified structure, however, is the best sense that the undersigned can make of the second amended complaint.

[3] Some of the causes of action identify who the claims being pursued against; *see, e.g.,* Docket No. 78 at 22 (Count I-Part B); and some, like Count II, do not.  *See* Docket No. 78 at 26-27.  However, within paragraph 147 of the second amended complaint, only "[d]efendant Hoar's conduct" is identified as the basis for this claim.  *See* Docket No. 78 at 26-27.

[4] Paragraph 153 identifies only "[d]efendant Hoar's above-described conduct" as violating the MCRA.  *See* Docket No. 78 at 27.

[5] Paragraph 159 identifies only Hoar's conduct as at issue.  *See* Docket No. 78 at 28.

No. 78 at 21-22 (Count I-Part A); (2) a hybrid § 1983 and MCRA claim brought by the hospital plaintiffs; *see* Docket No. 78 at 29-30 (Count VIII); (3) an assault and battery claim by the hospital plaintiffs; *see* Docket No. 78 at 30 (Count X); (4) a false arrest claim by the hospital plaintiffs; *see* Docket No. 78 at 31 (Count XI); (5) a false imprisonment claim by the hospital plaintiffs; *see* Docket No. 78 at 31 (Count XII); (6) a malicious prosecution claim by the hospital plaintiffs; *see* Docket No. 78 at 31 (Count XIII); (7) an intentional or reckless infliction of emotional distress claim by the hospital plaintiffs; *see* Docket No. 78 at 31 (Count XIV); (8) claims by all plaintiffs against the City compartmentalized into "Part A" under a caption for *Monell* liability; *see* Docket No. 78 at 31-34 and "Part B" under a caption for ratification; *see* Docket No. 78 at 34-35 (Count XV); and, (9) a claim of negligence. *See* Docket No. 78 at 35 (Count XVI).

III.    ARGUMENT

A.    Standard Of Review

Summary judgment shall be granted when there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56 (a). In this context, "[a] dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *American Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 75 (1st Cir. 2008).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Id.*  Once the moving party identifies those portions of "the pleadings, depositions, answers to interrogatories, . . . admissions . . . [and] affidavits, if any" that "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence

4

of disputed material facts necessitating a trial; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed.R.Civ.P. 56 (c) (1) and (A); or by demonstrating that the material cited by the moving party does not establish the absence of a genuine dispute. *See* Fed.R.Civ.P. 56 (c) (1) and (B).

In this endeavor, the summary judgment record usually is to be reviewed in the light most charitable to the non-movant. *See Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). While a reviewing court generally is to "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. . . ."; *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation and internal punctuation omitted); in order to defeat a motion for summary judgment, the non-movant may not rest upon some combination of conclusory allegations, improbable inferences and unsupported speculation, but must identify definite, competent evidence to rebut the motion. *See Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010); *see also Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581-83 (1st Cir. 1994). The weighing of evidence or the resolution of credibility determinations cannot occur at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In other words, "[t]he role of the trial judge at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

### B. Threshold Housekeeping

At the outset, there are several claims that can be dealt with briefly, as they are not viable causes of action. First, Count VIII is a claim that purports to be advanced both pursuant to § 1983 and the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H-I. *See* Docket No. 78 at 29-30. The MCRA claim may not be maintained against the City because the City is not a "person" for

purposes of the statutory scheme. *See Kelley v. LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002) (citation omitted); *see also Kendall v. City of Boston*, 21-CV-10711-ADB, 2022 WL 598165, *6 (D.Mass. Feb. 28, 2022). That aspect of Count VIII should be decided in favor of the City.

Next, Counts X, XI, XII, XIII and XIV reference that they are advanced either against all defendants or the defendants, of which the City assuredly is one. *See* Docket No. 78 at 30-31. The causes of action in these counts all are common law intentional torts. The City is immune from suit for intentional torts. *See* G.L. c. 258, § 10 (c); *see Kelley*, 288 F.3d at 12-13 (collecting authorities and noting that § 10 (c)'s list is illustrative, not exhaustive, and municipalities retain governmental immunity against all intentional torts). These claims are subject to summary disposition in favor of the City.

C.      The *Monell* Theory Cannot Survive Summary Judgment

"Count I-Part A" of the second amended complaint is a § 1983 claim brought by the representatives of Ruiz-Barreto's estate in which the City is identified as a defendant and in which the focus appears to be on asserted failures to recruit, train, discipline and supervise. *See* Docket No. 78 at 21-22. Count VIII is, in part, another § 1983 claim, this time brought by the five hospital plaintiffs, making similar claims of deficient training. *See* Docket No. 78 at 29-30. Count XV, identified as being on behalf of all plaintiffs, is a § 1983 claim broken into two components—what is styled as a *Monell* claim; *see* Docket No. 78 at 31-34; and a "ratification" claim pursuant to § 1983. *See* Docket No. 78 at 34-35. This structure is unnecessarily repetitive, but may be distilled to this simple proposition: municipalities may be subject to § 1983 liability pursuant to *Monell* and the way in which liability may be established according to that doctrine would be constitutionally-infirm failures related to hiring, training or supervision or, in a backward-facing perspective, by ratification of misconduct that already occurred. This

memorandum will proceed accordingly.

Although a municipality may not be held subject to § 1983 liability on a respondeat superior theory, § 1983 does impose "liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell*, 436 U.S. at 691-92. In order to establish such a claim, "a plaintiff must show that the violation occurred as a result of the municipality's 'policy or custom.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (citation omitted). Put differently, the execution of a municipal policy or custom must be "the 'moving force' behind the constitutional violation[.]" *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25 (1st Cir. 2005).

There is still more, because, "[t]he Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto respondeat superior, has set a very high bar for assessing liability under *Monell*[]" and a plaintiff consequently must demonstrate the "requisite level of fault," which is "deliberate indifference." *Id.*, 26. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 389 (1997). Additionally, not only must a plaintiff demonstrate the existence of a policy or custom, but the plaintiff must establish a "direct causal link" between the municipal action and the constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The affirmative linkage must be strong to establish municipal liability, as a "municipality's failure to train or supervise its police officers only becomes a basis for liability when 'action pursuant to official municipal policy of some nature *caused a constitutional tort*." *Kennedy v. Town of Billerica*, 617 F.3d 520, 531-32 (1st Cir. 2010); *see also Young*, 404 F.3d at 26-27 (dealing with a failure to train claim and concluding that "the identified deficiency [in the training program must

be] closely related to the ultimate injury"). The Supreme Court has termed these "rigorous standards of culpability and causation[.]" *Board of Comm'rs of Bryan Cty.*, 520 U.S. 397 at 404-405.

As to what constitutes policy or practice, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted). In other words, official policy "can take the form of either an 'officially adopted' policy statement or regulation . . . or an informal custom amounting to a widespread practice that, although 'not authorized by written law,' is 'so permanent and well settled as to constitute 'custom or usage' with the force of law.'" *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, 146 F.4th 115, 125 (1st Cir. 2025) (citation omitted); *see also Baron v. Suffolk Cnty. Sheriff's Dept.*, 402 F.3d 225, 236 (1st Cir. 2005) ("[U]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." (citation omitted).

### 1.    Official Policy

There is no basis, and the plaintiffs to date do not suggest otherwise, that any written policy of the Fall River Police Department is deficient on a constitutional level. Indeed, such would be a difficult path to travel given that, for some time, the Department has been credentialed by the gold standard certification authority that uses external assessors to measure law enforcement agencies according to best national practices: the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA"). *See* SOF, ¶¶ 14-17. In fact, the plaintiffs' expert, Dr. George Kirkham, has described the policies and procedures of the Fall River Police Department as both "solid" and "fine[.]" SOF, ¶ 159.

8

## 2.    Deficient Hiring

As to initial hiring, the Fall River Police Department is a civil service agency that selects its officers from a standardized and state-run process.  *See* SOF, ¶¶ 1-8.  During discovery, beyond stray questions during depositions about backgrounds, the plaintiffs have expended no effort in developing an unlawful hiring theory.  This is a most difficult theory to advance in any event; *see Wilson v. Cook County*, 742 F.3d 775, 782-783 (7th Cir. 2014) (considering a municipal liability claim for alleged failure to screen an employee; concluding that the tethering of causation must be strong and demonstrate "that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff[]" such that "a plaintiff must connect the dots between the past conduct and the specific constitutional violation" (citations omitted and emphasis in original)); and, in any event, is not made here.

## 3.    Failure To Train

Similarly, there is no support in the record for a failure to train theory of liability, recognizing that "a training program must be quite deficient in order for the deliberate indifference standard to be met:  the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing."  *Young*, 404 F.3d at 27.  Fall River police candidates are sent to a state-run police academy that lasts for six months and, if they graduate, officers:  (1) undergo field training within the Fall River Police Department; (2) yearly mandatory in-service training based upon a state-set curriculum instructed by state-certified individuals, but which always includes use of force instruction; and, (3) additionally, may receive additional focused training either for purposes of an assignment or as a component of discipline.  *See* SOF, ¶¶ 8-13.  As the statement of facts associated with this motion practice reveals, there are numerous instances in which, as a function of discipline imposed, officers of

9

the Fall River Police Department undergo remedial or like training to correct misbehavior found to exists. *See generally* SOF, Sections II. and IV. To advance beyond summary judgment, there must be a demonstration by the plaintiffs that the "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) (citation omitted). That is not possible here.

### 4. Failure To Supervise

The theory of municipal failure to supervise, it appears, lies at the heart of the plaintiffs' *Monell* claim. *See, e.g.*, Docket No. 78 at 11, ¶ 70 (referencing asserted failures, prior to November 12, 2017, to act in response to misconduct). In order to establish liability under a failure-to-supervise theory, the plaintiffs must demonstrate sufficiently a pattern of constitutional violations. *See, e.g., Salem v. Stoneham Police Dept.*, 752 F.Supp.3d 282, 299 (D.Mass. 2024) (considering "whether [defendant's] disciplinary practices demonstrate a broad failure to supervise and discipline its officers"); *Barker v. City of Boston*, 795 F.Supp.2d 117, 124 (D.Mass. 2011) (a plaintiff "must show a persistent failure to discipline."). At the same time, "the failure of a police department to discipline in a specific instance" cannot give rise to liability under *Monell*." *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989).

As a function of the stringent standard for *Monell* liability, requiring deliberate indifference that is enough to satisfy "rigorous standards of culpability and causation[;]" *Board of Comm'rs of Bryan Cty.*, 520 U.S. 397 at 389, 404-405; "[n]otice is a salient consideration in determining the existence of supervisory liability." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (citation omitted). Although *Camilo-Robles* was a supervisory liability case, the First Circuit has used the same approach, looking at whether an officer's disciplinary history was of a

quantity and quality sufficiently related to the instant dispute such that the history would establish a relevant propensity, for constitutional purposes, to consider supervisory and municipal liability. *See Saldivar v. Racine*, 818 F.3d 14, 18-20 (1st Cir. 2016). So, in *Saldivar*, an officer's prior disciplinary history, which was lengthy but absent acts of violence, was insufficient, at the motion to dismiss stage, to sustain claims of supervisory and municipal liability pursuant to § 1983 based upon an act of violence. *See id.*

Constitutional notice is not provided by prior instances of dissimilar misconduct, in the vein of a notion that an officer who previously broke rules of a different type believed that he did not have to follow police regulations of any sort, leading to supervisory or municipal liability because the officer then later broke a qualitatively different rule in the case at hand. *See id.*, 18-19. Instead, a "plaintiff must, at the very least, produce evidence that serious prior incidents *similar to the alleged constitutional violation in question* put the municipality on inquiry notice of an officer's danger to the public and that the police department's policy of ignoring or covering up those incidents was 'the moving force' behind the alleged violation." *Eason v. Alexis*, 824 F.Supp.2d 236, 246 (D.Mass.2011) citing *Young*, 404 F.3d at 25-28 (emphasis added). In *Eason*, a case in which a civilian claimed that officers used a quantum of force that was excessive, the Court concluded that prior complaints against an officer, including domestic altercations that the officer was involved in and allegations that the officer had acted disrespectfully, had nothing "to do with the kind of constitutional violations alleged in this case." *Eason*, 824 F.Supp.2d at 246. Additionally, even a prior allegation of excessive force on the job, ruled unfounded by internal affairs, "bears no similarity to the alleged violation in this case" and was not considered as significant for analysis. *Id.* citing *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 583 n.5 (1st Cir. 1994) (prior dissimilar citizen complaints cannot support a *Monell* claim); *accord Lewis*

11

*v Pugh*, 289 Fed.Appx. 767, 769, 772-73 (5th Cir. 2008) (per curiam) (prior allegations of excessive force insufficient to sustain deliberate indifference finding for rape because the prior acts must be "fairly similar to what ultimately transpired[]" (citation omitted)).  The First Circuit specifically has rejected the notion as "too tenuous" that prior varied issues, such as cruiser accidents, negligent investigations, improper personal behavior and inattention to uniform requirements, led an officer to believe "he could get away with anything" such that liability could attach for an officer's use of excessive force.  *See Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 93-94 (1st Cir. 1994); *see also Ramirez-Lluveras v. Pagan-Cruz*, 833 F.Supp.2d 165, 176 (D.Puerto Rico 2011) (in case involving the assault and killing of a citizen during an arrest, reviewing seven prior complaints against officer and determining that only two involved crimes against a person and of those, only one was substantiated and it was dissimilar in that it did not occur while on duty or acting under color of law).

Here, the employment histories, including appointments, separations, complaints and discipline, for each of the fifteen individual defendants remaining in this action have been detailed at some length.  *See* SOF, Section IV., pp. 12-25, ¶¶ 71-156.  These histories include even those events and pieces of discipline that postdate the November, 2017 events at issue here, because there is precedent that indicates that "post-event evidence of the lack of proper internal investigation . . . and the failure [to] take strong disciplinary action against the officers involved" may "show what the customs or policies were in effect" at the time of the alleged constitutional violation.  *Bordanaro v. McLeod*, 871 F.2d 1151, 1166 (1st Cir. 1989).  While normally post-event evidence is invoked to demonstrate the existence of a constitutionally-infirm culture at the time of the subject matter at issue in a particular case, here the record reveals quite to the contrary.  Most notably, when, in 2019, information was revealed that Michael Pessoa had

engaged in the use of unreasonable force and had not been honest in his reporting, he was charged criminally, he was convicted and he was terminated.  *See* SOF, ¶ 140.  Two other officers involved in that 2019 event who are named defendants here, Sean Aguiar and Thomas Roberts, were involved in the reporting issues in that matter—Aguiar resigned and Roberts was fired.  *See* SOF, ¶¶ 75, 146.  Similarly, as to Nicholas Hoar, when in 2019 concerns were raised about the number of occasions on which he used force in 2018, an early warning system review was activated, which led to a detailed review of those situations, and, later in 2020, when another use of force incident occurred, Hoar was charged criminally, convicted and resigned from the Department.  *See* SOF, ¶¶ 100, 102.  This confirms that, when the municipality becomes possessed of information that it believes suggests that its officers used unreasonable force or did not report matters accurately, officers are separated from employment and even charged criminally.

Assessing these officers' employment histories, both before and after the events of November, 2017, reveals no basis in the summary judgment record that would be sufficient to satisfy the stringent deliberate indifference standard that features "rigorous standards of culpability and causation[.]" *Board of Comm'rs of Bryan Cty.*, 520 U.S. 397 at 389, 404-405.  In the main, the officers' histories are negative for anything of the sort of physically abusive or other accusations made in this case and, indeed, mostly involve procedural improprieties, at-fault cruiser accidents or sick leave abuse.  *See* SOF, Section IV., pp. 12-25, ¶¶ 71-156.  Even the officer with the most involved history, Pessoa, has a background that mostly involved policy violations such as failing to follow orders about taking blankets out of cells, insubordination, unprofessional verbal encounters or wearing earmuffs out of the bounds of the uniform policy.  *See* SOF, ¶¶ 121-40.  In fact, much of the histories for the officers in the collective exist outside

13

the universe of abuse allegations.  *See* SOF, Section IV., pp. 12-25, ¶¶ 71-156.  Much more

would be needed to meet the rigorous *Monell* standard and it is not presented here.

There is an additional pin to place in this form of theory given that the plaintiffs' own

expert worked extensive damage to the plaintiffs' claim against the City.   During his deposition,

Dr. George Kirkham identified Hoar and Pessoa as "rogue" police officers, going so far as to say

that calling Hoar a rogue officer would be "putting it mildly[.]"  SOF, ¶¶ 160-61.  Further, on his

own initiative no less, Dr. Kirkham indicated, repeatedly, that Hoar's shooting of Ruiz-Barreto

was both a murder and an execution.  *See* SOF, ¶¶ 161-62.  When asked what, if anything, Dr.

Kirkham possessed by way of information that a supervisor or the City could have known

beforehand that Hoar was going to commit a murder in November, 2017, Dr. Kirkham testified,

in pertinent part, ". . . no, to answer your question, I don't think, unless you had a crystal ball,

that you would know that he—he went out there to do severe harm. . . ."  SOF, ¶ 163.  *Monell*

does not require deployment of a crystal ball and even prior allegations of garden-variety

excessive force, authority indicates, do not place a municipality on notice of the type of murder

accusation made here.  *See Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 796 (8th Cir. 1998)

(distinguishing an allegation of rape accomplished through the coercive power of a badge as

qualitatively dissimilar to prior instances of garden-variety excessive force).

### 5.    Ratification

The plaintiffs' last grasp at the shores of *Monell* concerns ratification.  A few months

ago, the First Circuit had occasion to consider ratification, noting that it:

> has yet to fully delineate the 'precise contours of this ratification doctrine,' [but] we have
> explained the requirement that municipal approval must be active, not passive. . . . We
> have also explained that the active approval must be with respect to both the
> 'subordinate's decision and the basis for it.' . . . . And, as the Supreme Court set out in
> [*City of St. Louis v.*] *Prapotnik*, [485 U.S. 112, 130 (1988) (plurality opinion)], '[s]imply
> going along with [a subordinate's discretionary decisions' or 'mere[ly] fail[ing] to

investigate the basis of a subordinate's discretionary decisions' does not equal ratification.

*Lavigne*, 146 F.4th at 128 (some citations omitted; some brackets in original).

On this record, the plaintiffs' ratification theory seems to be grounded in two parts. First, based upon a conversation with the District Attorney following the shooting, Dupere, who just had been sworn in as Chief of Police, commented in response to a media member's question that he believed that the shooting would be determined to have been justified. *See* SOF, ¶¶ 42-45. In this regard, the plaintiffs' ratification claim here is materially similar to that presented in *Lavigne*, where an issue involved ratification through a board comment that it was not aware of any preceding violation of law or policy that would require further action. 146 F.4th at 121, 127-28. The First Circuit rejected ratification there, determining that such a statement was not anything like the ratification that the Supreme Court had in mind in *Prapotnik*. *Lavigne*, 146 F.4th at 127-28. The same is true here as Dupere's clipped and undeveloped statement, which factually was based upon what the District Attorney had told him concerning the status of the investigation to that point in time, is not of the sort necessary to establish municipal ratification.

Second, it would appear that the plaintiffs argue for application of ratification because the officers involved in the shooting and in the hospital arrests were not found responsible for violations of law or policy in the inquiries that followed. *See* SOF, ¶¶ 46-70. While the contours of ratification are not yet precisely defined in this Circuit, this form of argument would do exactly what the Supreme Court has admonished against: collapsing municipal liability into de facto respondeat superior. *See Young*, 404 F.3d at 25-26. In other words, in any instance in which a supervisor or a municipality arrived at the conclusion that a subordinate's action did not violate the law or policy and did not sanction the subordinate, *Monell* liability could be said to exist on the basis of ratification. There is no support for such a radical transformation of *Monell*.

15

In the final analysis, the November, 2017 events underlying this matter were reviewed by the Massachusetts State Police, the District Attorney's Office, the shooting investigation team, the shooting review board and the Chief of Police.  From different perspectives and with different focuses, all arrived at the same conclusion—the officer-involved shooting was justified and there was no reason to discipline any officer either in association with the shooting or the hospital arrests.  On this record, there has been no deliberate indifference shown.  The City is entitled to the entry of summary judgment in its favor.

**D.      The Negligence Claim Fails**

The last claim involving the City is Count XVI, alleging negligence.  *See* Docket No. 78 at 35.  Pursuant to the Massachusetts Tort Claims Act; G.L. c. 258, § 2, "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances. . . ."

In order to state a claim for negligence under Massachusetts law, a plaintiff must allege adequately that:  (1) the defendant owed a legal duty; (2) there was a breach of that duty; and, (3) the plaintiff suffered damages as a result of that breach, an issue of causation.  *See Glidden v. Maglio*, 430 Mass. 694, 696 (2000).  The existence of a duty is a question of law.  *See Leavitt v. Brockton Hosp.*, 454 Mass. 37, 40 (2009); *see also Jupin v. Kask*, 447 Mass. 141, 146 (2006); *Coughlin v. Titus & Bean Graphics, Inc.*, 54 Mass. App.Ct. 633, 638 (2002).  The Supreme Judicial Court has recognized that "[a]s a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others[;]" *Remy v. MacDonald*, 440 Mass. 675, 677 (2004) (citations and internal quotation marks omitted); however, "[a] precondition to

this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor." *Afarian v. Mass. Elec. Co.*, 449 Mass. 257, 262 (2007). In addition to the materiality of the foreseeability question in connection with whether a duty can be said to exist, the first prong of the standard, foreseeability also is an essential element of the causation analysis, the third prong, given that "[w]hether negligent conduct is the proximate cause of an injury depends . . . on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." *Kent v. Commonwealth*, 437 Mass. 312, 320 (2002). An actor should be liable only for injuries that were among the reasonably understood potential harms that allegedly made the actor's conduct tortious, a limitation that seeks to avoid "what might be unjustified or enormous liability by confining liability's scope to the reasons for holding the actor liable in the first place. *Leavitt*, 454 Mass. at 45 and n.20, 47 (citations omitted).

"Questions of reasonable foreseeability are ordinarily left to the jury, but the judge may properly decide them as a question of law where the harm suffered, although within the range of human experience, is sufficiently remote in everyday life as not to require special precautions . . . ." *Westerback v. Harold F. LeClair Co., Inc.*, 50 Mass.App.Ct. 144, 146 (2000). So, in *Whittaker v. Saraceno*, 418 Mass. 196, 200 (1994), the Supreme Judicial Court concluded, as a matter of law, that the rape of a female office worker by an intruder was not a foreseeable injury to be apprehended by the landlord because "there was no evidence of previous crimes in the office portion of the building in which the plaintiff was attacked." In other words, "[t]here is no duty owed when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant." *Jupin*, 447 Mass. at 147 (citations omitted).

The analysis as to whether the harm claimed by the plaintiffs was foreseeable as a matter of law to the City for purposes of a negligence claim is a similar, if not functionally identical,

17

inquiry as the one evaluating whether the City, based on the officers' disciplinary histories, was the moving force behind any constitutional injury claimed by the plaintiffs to have been suffered. *See Dobos v. Driscoll*, 404 Mass. 634, 653 (1989) (explaining that municipalities can be sued for supervisory negligence "where the supervisory officials allegedly had, or should have had, knowledge of a public employee's assaultive behavior[]"); *see also Doe v. Blandford*, 402 Mass. 831, 836-38 (1988) (same).  The First Circuit has treated these constitutional and negligence inquiries as materially similar in like circumstances.  *See Saldivar*, 818 F.3d at 20-22 (affirming dismissal of negligence claim against City because an officer's prior disciplinary history, which featured incidents qualitatively unlike the harm claimed to have been suffered by the plaintiff, was not enough to render it sufficiently foreseeable to the City that the officer could engage in such behavior).  Even when past misconduct is linked, that alone is not enough when disciplinary action was taken in the past.  *See Clancy v. McCabe*, 441 Mass. 311, 311-14, 319-322 (2004) (rejecting a claim of supervisory liability involving a state trooper who was alleged to have been involved in inappropriate and unprofessional conduct with four female motorists, for which a sanction of a six-month suspension and referral to the stress unit was imposed, when the trooper then reoffended after his return, illegally strip searching and making lewd and suggestive remarks to the plaintiff; concluding that disciplinary action had been taken and there was no indication that the supervisor would believe that the sanctioned trooper then would reoffend and "continue to harass female motorists[]"); *Tambolleo v. Town of West Boylston*, 34 Mass.App.Ct. 526, 530-31 (1993) (rejecting municipal liability claim, in context of an officer with prior complaints of misconduct, because the nature of the prior complaints was not adduced in the record and, even if officials should have done more in response to the plaintiff's complaint, a failure to discipline in a specific instance is not an adequate basis to hold a municipality liable).

On this record, when the officers involved here broke rules of any type prior to November, 2017, they were sanctioned for the actions. The plaintiffs cannot meet their burden to advance this claim further and judgment should enter in favor of the City.

## IV.    CONCLUSION

For those reasons, the City respectfully requests that this Court enter summary judgment in its favor as to all claims made against it.

<div style="margin-left:50%">

DEFENDANT CITY OF FALL RIVER,
By his attorney,

/s/ Andrew J. Gambaccini
Andrew J. Gambaccini, BBO #:  654690
Vigliotti, Gambaccini & Akerson, P.C.
4 Lancaster Terrace
Worcester, MA 01609
508.686.0979
agambaccini@vgalawpc.com

</div>