UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAYLIMAR NATAL-LUGO, et al.          :
     Plaintiffs,                   :
                                   :
v.                                    :          C.A. No.:  20-CV-11979-GAO
                                   :
CITY OF FALL RIVER, et al.,           :
     Defendants.                   :
                                   :

**OMNIBUS STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED IN COMPLIANCE WITH LR, D.MASS. 56.1 CONCERNING THE CITY OF FALL RIVER AND ALBERT DUPERE'S MOTIONS FOR SUMMARY JUDGMENT**

**DEFENDANTS' PREFACE**

Pursuant to LR, D.Mass. 56.1, the following omnibus statement of undisputed material facts[1] is submitted in connection with defendants City of Fall River and Albert Dupere's separately-filed motions for summary judgment. The City and Dupere are cognizant that other defendants contemporaneously are filing motions for summary judgment concerning the civil rights and other claims made against those defendants. As their respective memoranda of law point out, the municipal and supervisory liability claims against the City and Dupere stand on different, and additional, footing. While underlying constitutional violations are necessary in order to sustain municipal and supervisory liability claims, underlying constitutional violations do not establish municipal or supervisory liability without more. Accordingly, and in order to avoid unnecessary repetition, this statement will not focus on the "ground-level" summary judgment record set out by those defendants, but instead on those pieces of the record that carry

---

[1] It is a familiar summary judgment principle that properly supported facts are to be construed in the light most favorable to the non-moving party or parties, in this instance the plaintiffs. *See Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Consistent with that requirement, this statement of facts constitutes a factual predicate that is not, or cannot be, disputed by the plaintiffs.

1

material significance for the claims involving the City and Dupere.

## PLAINTIFFS' PREFACE

Pursuant to Fed. R. Civ. P. 56, Local Rule 56.1, and the Court's Standing Order Re: Briefing of Summary Judgment Motions, Plaintiffs hereby submit this Combined Statement of Material Undisputed Facts. Defendant City of Fall River's statement of facts is reprinted verbatim below, followed immediately by Plaintiffs' evidentiary responses.

## I.    THE STRUCTURE OF THE FALL RIVER POLICE DEPARTMENT

1.    In November of 2017, the Fall River Police Department was made up of more than 200 sworn police officers. *See* Affidavit of Albert Dupere, appended hereto and designated as "Attachment A[,]" ¶ 29.

**Pls. Resp.:**  Admitted.

2.    The sworn personnel were assigned to various units or divisions within the Department and included individuals occupying the ranks of police officers, sergeants, lieutenants, captains, deputy chiefs and a chief of police. *See* Attachment A, ¶ 29.

**Pls. Resp.:**  Admitted.

3.    While the position of Chief of Police and certain other positions not of significance here are not civil service positions, the Fall River Police Department is a civil service agency. *See* Attachment A, ¶ 30.

**Pls. Resp.:**  Admitted.

4.    In order to receive appointment as a police officer for the Fall River Police Department, candidates take a statewide civil service examination. *See* Attachment A, ¶ 30.

**Pls. Resp.:**  Admitted.

5.    Based upon examination performance and factors that include veteran status or residency,

candidates then are placed in a ranked order on an eligible list.  *See* Attachment A, ¶ 30.

**Pls. Resp.:**  Admitted.

6.    When the Fall River Police Department then seeks to hire a police officer, a request is made from the Civil Service Unit of the Human Resources Division of the Commonwealth of Massachusetts for a list of candidates—the number of candidates' names received is based upon the number of hires that the Department wishes to make at that time.  *See* Attachment A, ¶ 30.

**Pls. Resp.:**  Admitted.

7.    If candidates express an interest in pursuing consideration, there is a pre-employment review that includes medical and background evaluations.  *See* Attachment A, ¶ 31.

**Pls. Resp.:**  Admitted.

8.    If selected for appointment, candidates are sent to a full-time police academy that lasts for approximately six months.  *See* Attachment A, ¶ 31.

**Pls. Resp.:**  Admitted.

9.    Police academies for municipal departments in Massachusetts are run by the Municipal Police Training Committee, which oversees the various academies across the Commonwealth and establishes the curricula for training.  *See* Attachment A, ¶ 32.

**Pls. Resp.:**  Admitted.

10.    If the individual is graduated from the academy, that is the point in time that the individual will begin work as a probationary officer, who has no employment protections for one year.  *See* Attachment A, ¶ 33.

**Pls. Resp.:**  Admitted.

11.    During that probationary period, the officer must undergo a field training phase.  *See* Attachment A, ¶ 33.

**Pls. Resp.:**  Admitted.

12.    Every year, each officer undergoes mandatory in-service training that lasts for one week. The Commonwealth of Massachusetts sets the curriculum each year and the training is conducted only by certified Municipal Police Training Committee instructors.  The training varies dependent on the year, but always includes use of force instruction.  *See* Attachment A, ¶ 34.

**Pls. Resp.:** Qualified. Admitted that training occurs, but Disputed that the training adequately deterred or disciplined officers from using excessive force, as evidenced by Officer Hoar's blatant violations of felony car stop and unknown risk protocols. Furthermore, Plaintiffs dispute that the FRPD adequately trained or supervised officers on proper protocols for a Priority 1 "shots fired" call; rather, the FRPD permitted an unconstitutional custom of "cross-blocking" which boxed the vehicle in and caused the fatal escalation. Finally, FRPD Policy explicitly forbids shooting at a moving vehicle, commanding officers to "move out of the path" instead, a mandate entirely ignored here. [Cite: **Second Amended Complaint, Docket No. 77 at ¶¶ 38-41, 104-105; Expert Report of Dr. George Kirkham, Exhibit X at 4-9**; **Deposition of George Kirkham, Docket No. 261-26** at 164-167; **Deposition of Michael Pessoa, Exhibit S** at 165; **FRPD Use of Force Policies, Exhibit F** at 53].

13.    Officers also may receive additional or specialized training dependent upon assignment within the Department or as a consequence of a disciplinary action. *See* Attachment A, ¶ 35.

**Pls. Resp.:**  Admitted.

14.    The Fall River Police Department has a written set of policies, procedures, rules and regulations that concern departmental operations and the behavior of officers.  *See* Attachment A, ¶ 36.  Officers are required to understand and apply those written authorities in their conduct. *See* Attachment A, ¶ 37.

**Pls. Resp.:**  Admitted.

15.    The Fall River Police Department is accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA").  *See* Attachment A, ¶ 38.

**Pls. Resp.:**  Admitted.

16.     CALEA accreditation is a voluntary process through which a law enforcement agency can seek certification that it meets an established set of professional standards across the operations of the agency which, generally speaking reflect best practices in the industry.  *See* Attachment A, ¶ 38.

**Pls. Resp.:**  Admitted.

17.     The process involves the review of a department by external assessors for compliance with national standards, including in the areas of the use of force, training and administration. *See* Attachment A, ¶ 39.  Once accredited, an agency must under periodic reassessment for continued compliance with those standards.  *See* Attachment A, ¶ 39.

**Pls. Resp.:**  Admitted.

## II.     AN OVERVIEW OF THE DEPARTMENT'S DISCIPLINARY HISTORY

18.     As a function of the plaintiffs' discovery requests concerning professional standards material, the summary judgment record, in the main, has three components that exist in general overview of the Fall River Police Department's professional standards history stretching back decades.  Appended hereto and designated as "Attachment B" is a computerized overview listing of professional standards material from 2014 through 2018, the year after the officer-involved shooting and hospital arrests at issue in this case.  Attachment B includes, among other disciplinary material, a January, 2017 incident arising out of which an officer was reprimanded for a use of force policy violation in April, 2017.  *See* Attachment B, COFR 11399.

**Pls. Resp.:** Qualified. Admitted that records exist, but Disputed that the records demonstrate adequate discipline. The FRPD maintained a custom of systematically covering up misconduct, fostering a code of silence, and failing to appropriately discipline officers. Plaintiffs' expert Dr. Kirkham identified that the FRPD's 5-year Internal Affairs record retention policy was used to purge pre-2017 pattern evidence, fostering an environment of lenient IA investigations and impunity for rogue officers. Furthermore, despite 15 to 20 officers being involved in the unprovoked assault on the Ruiz family at Charlton Hospital, only 4 mandatory use of force

reports were filed, and no discipline was rendered for the blatant falsification of police reports. [Cite: **Docket No. 77** at ¶¶ 56-57, 69-71, 106; **Exhibit X** at 4-9; **Interrogatory Answers Dimex Ruiz, Exhibit T** at 24-25].

19.    Appended hereto and designated as "Attachment C" is documentation evidencing

discipline imposed upon retired Fall River police personnel stretching back to the 1980s.

**Pls. Resp.:** Admitted that the attachment contains the referenced documents.

20.    Appended hereto and designated as "Attachment D" is additional documentation

evidencing discipline imposed for decades.  Among the pieces of discipline documented within

Attachment D is a one-day suspension served as a punishment duty day for the use of force in

2012; *see* Attachment D, COFR 11573; and for allegations of untruthfulness, conduct

unbecoming and insubordination, 2018 discipline in the form of a twenty-day suspension and a

last chance agreement.  *See* Attachment D, COFR 11567.

**Pls. Resp.:** Admitted that the documents show these specific entries, but Disputed that they represent a functional disciplinary system, as high-ranking officials deliberately ignored widespread excessive force and false reporting by prominent officers like Michael Pessoa and Nicholas Hoar. [Cite: **Docket No. 77 at ¶¶** 70, 73, 77-81, 95; **Exhibit X at 4-9**-9; **Exhibit T** at 5-7].

### III.    THE RECORD CONCERNING ALBERT DUPERE

21.    Dupere became a Fall River police officer in 1987.  *See* Attachment A, ¶ 3.  In 1994,

Dupere was promoted temporarily to the rank of sergeant and that promotion was made

permanent in 1995.  *See id.*  Dupere later was promoted to lieutenant in 1999 and captain in

2004.  *See id.*

**Pls. Resp.:**  Admitted.

22.    In 2010, Dupere became, on an interim basis, one of the two Deputy Chiefs of Police in

the Fall River Police Department, a promotion that became permanent in 2011.  *See* Attachment

A, ¶ 4.

**Pls. Resp.:** Admitted.

23.    At the time that Dupere became a Deputy Chief, the Chief of Police for the Fall River Police Department was Daniel Racine.  *See* Attachment A, ¶ 4.

**Pls. Resp.:** Admitted.

24.    The Chief of Police in Fall River is the appointing authority for the police personnel in the Department and, under the civil service law, it is the Chief of Police who has the authority to suspend, demote or terminate officers.  *See* Attachment A, ¶ 46.

**Pls. Resp.:** Admitted.

25.    At some point prior to the summer of 2017, Chief Racine took a medical leave of absence.  *See* Attachment A, ¶ 6.  Chief Racine had taken medical leave in the past, ranging from a few weeks to a couple of months.  *See* Attachment A, ¶ 7.  During Chief Racine's absences, Dupere served as Chief of Police in an acting capacity.  *See* Attachment A, ¶ 7.

**Pls. Resp.:** Admitted.

26.    Sometime around August, 2017, Chief Racine announced that he would be retiring and the then-Mayor of the City of Fall River discussed the position with Dupere; after considering the matter, Dupere was appointed as Chief of Police and sworn in on December 1, 2017.  *See* Attachment A, ¶¶ 8-9.

**Pls. Resp.:** Admitted.

27.    At the time of the events that give rise to this lawsuit in November, 2017, Dupere was acting Chief of Police.  *See* Attachment A, ¶¶ 6-9.

**Pls. Resp.:** Admitted.

28.    On November 12, 2017, just before midnight, the Fall River Police Department received

a call for service from a civilian who reported a car smoking, two loud bangs that the civilian

was unsure if they were gunshots and a lot of cars in the vicinity of those observations. *See*

Attachment A, ¶ 11. Officers responded and, some minutes later, there was a report of shots

fired. *See id.*

**Pls. Resp.:** Qualified. The Priority 1 Call Log confirms the initial call at 23:38 reported a "green hatchback with stickers all over it smoking" and "2 loud bangs" that "sounded like gun shots." The 911 callers explicitly reported that only 5 cars were present, contradicting Officer Hoar's claim that 15-20 cars were present. The "shots fired" call occurred precisely 9 minutes later at 23:47. The FRPD failed to follow proper protocol for a Priority 1 "shots fired" call, leading directly to the unconstitutional stop of the Acura. [Cite: **Exhibit S** at 165; **FRPD Priority 1 Call Log 11/12/17, Exhibit B**; **Docket No. 77 at ¶¶** 30-32, 38-41].

29.    Dupere was not working at the time and believes that he was home and sleeping when he

received a call that there had been an officer-involved shooting. *See* Attachment A, ¶ 12. It is

unknown, relative to the shooting, at what point Dupere received that notification. *See*

Attachment A, ¶ 12.

**Pls. Resp.:** Admitted.

30.    Dupere dressed and drove to the area, where he encountered an outer perimeter that had

been established by police cruisers blocking the road. *See* Attachment A, ¶ 13. The outer

perimeter was at a distance from the actual scene, but Dupere could see personnel and vehicles

there. *See* Attachment A, ¶ 14.

**Pls. Resp.:** Admitted.

31.    Although he was the acting Chief of Police, Dupere understood that the Office of the

District Attorney had jurisdiction over the matter and the Massachusetts State Police Detective

Unit attached to the District Attorney's Office would conduct the investigation into the shooting.

*See* Attachment A, ¶ 15. While the Fall River Police Department had a role, such as securing the

scene until the arrival of the State Police and providing the State Police with the officer's

weapon, Dupere did not have any assigned task and chose, as a consequence, not to enter the scene without a necessary purpose. *See* Attachment A, ¶¶ 15-16.

**Pls. Resp.:** Qualified. Admitted that Dupere did not enter the scene, but Disputed that the FRPD correctly or legally secured the scene. The crime scene was actively manipulated, and the Acura was moved from its original parked position on the side of the road to sideways in the middle of the roadway. Furthermore, immediately after the shooting, FRPD officers inexplicably handcuffed the uninjured passenger of the Acura and detained him in a cruiser without cause. [Cite: **Docket No. 77 at ¶¶** 34, 42, 52; **Expert Report of Donald Mong, Exhibit W at 15-16**; **Deposition of Chief Albert Dupere, Exhibit M** at 21; **FRPD response to Shooting scene 11/12/17, Exhibit D** at 1].

32.    Dupere inquired if there was a need for additional people or resources on scene and, when told there was not, Dupere left after a couple of minutes without entering the established perimeter. *See* Attachment A, ¶ 16.

**Pls. Resp.:**  Admitted.

33.    Dupere went to the hospital where involved officers were brought to be evaluated—St. Anne's Hospital. *See* Attachment A, ¶ 17.  There, Dupere saw Officer Nicholas Hoar laying in a hospital bed and told Hoar that there would be an investigation and that Dupere was not saying that Hoar had done anything right or anything wrong. *See* Attachment A, ¶ 18.  Dupere asked if Hoar was alright and to let Dupere know if Hoar needed anything. *See* Attachment A, ¶ 18. Dupere then went home. *See* Attachment A, ¶ 18.

**Pls. Resp.:**  Admitted.

34.    Dupere did not go to Charlton Memorial Hospital on November 12, 2017 or November 13, 2017. *See* Attachment A, ¶ 17.

**Pls. Resp.:**  Admitted.

35.    Dupere was not present at the time of the officer-involved shooting on November 12, 2017, nor was he present at Charlton Memorial Hospital later that night when arrests of plaintiffs

in this matter were made.  *See* Attachment A, ¶ 41.

**Pls. Resp.:**  Admitted.

36.    There is no suggestion in the record that Dupere ever has met or interacted in any fashion either with Larry Ruiz-Barreto or any of the plaintiffs.    *See* Attachment A, ¶ 40.

**Pls. Resp.:**  Admitted.

37.    Dupere was not involved in the arrests or prosecutions of the plaintiffs who were arrested at the hospital.  *See* Attachment A, ¶ 41.

**Pls. Resp.:** Disputed. As acting Chief and subsequent Chief, Dupere was responsible for the policies, supervision, and ratification of the malicious prosecutions. Dupere completely failed to investigate or discipline the ~20 officers involved in the brutal, unprovoked Charlton Hospital assault on the grieving Ruiz family, and permitted Officer Pessoa and Officer Aubin to orchestrate a cover-up through synchronized, fabricated police reports. [Cite: **Docket No. 77 at** ¶¶ 56-59, 77 at 206-207; **Exhibit T** at 24-27, 47-49].

38.    Dupere did not threaten, intimidate or coerce any of the plaintiffs either into doing something or not doing something.  *See* Attachment A, ¶ 41.

**Pls. Resp.:** Disputed. Dupere ratified the unlawful actions of his subordinates by protecting them from accountability. Specifically, he took no action when 15-20 officers filed only 4 use of force reports for a brutal hospital gang assault where multiple family members were choked, tased, and beaten with batons. [Cite: **Docket No. 77 at** ¶¶ 69, 77 at 106, 194-196; **Exhibit T** at 18-20, 25].

39.    Dupere was not a participant to any form of agreement to do anything to impact the plaintiffs or their rights.  *See* Attachment A, ¶ 42.

**Pls. Resp.:** Disputed. Dupere participated in a systemic cover-up, upholding flawed Shooting Review Board findings that endorsed an unconstitutional custom of "cross-blocking," ignored FRPD Policy forbidding shooting into a stationary vehicle, and ratified a fabricated narrative despite it being physically impossible for the Acura to have moved as described. [Cite: **Shooting Review Board Pamphlet, Docket No. 261-7** at 1-2; **Dupere Order Hoar Exoneration, Docket No. 261-9** at 1; **Exhibit X** at 8-9; **Exhibit W at 15-16**; **Docket No. 77 at** ¶¶ 38-41, 49, 126, 206-207].

40.    Dupere never has received information about any such plan in which others were in

agreement.  *See* Attachment A, ¶ 42.

**Pls. Resp.:** Disputed. Dupere received and endorsed investigation reports that explicitly contradicted the physical evidence of the shooting and the hospital video footage proving false arrests. [Cite: **Docket No. 77 at ¶¶** 49-50, 77 at 206-207].

41.     Dupere did not engage in any overt or other conduct in furtherance of any such

agreement.  *See* Attachment A, ¶ 42.

**Pls. Resp.:** Disputed. Dupere overtly ratified Hoar's unconstitutional conduct by returning him to full duty without discipline despite blatant violations of FRPD Policy on moving vehicles. As concluded by Dr. Kirkham, Dupere endorsed false narratives despite physical evidence proving the vehicle never moved. [Cite: **Docket No. 261-9** at 1; **Exhibit X** at 8-9; **Exhibit W at 15-16**; **Exhibit F** at 53; **Docket No. 77 at ¶¶** 38-41, 56-59, 77 at 206-207; **Exhibit M** at 27-30, 101].

42.     At some point later in the month of November, 2017, Dupere saw District Attorney

Thomas Quinn and spoke briefly with him.  *See* Attachment A, ¶ 19.  The District Attorney

mentioned this officer-involved shooting and told Dupere that there should be an answer pretty

soon and that everything looked ok.  *See id.*

**Pls. Resp.:** Admitted that the conversation took place, but Disputed that "everything looked ok." The District Attorney's premature statement to Dupere demonstrated a pre-determination of the case's outcome prior to a complete investigation. [Cite: **Docket No. 77 at ¶¶** 48-49; **Exhibit M** at 19-20].

43.     Dupere, who did not know the particulars of the State Police investigation to that point,

understood the District Attorney's comment to reflect his understanding of the status of the

continuing investigation to that point in time.  *See* Attachment A, ¶ 19.

**Pls. Resp.:** Admitted as to Dupere's claim of his understanding.

44.     After Dupere was sworn in as Chief of Police on December 1, 2017, a reporter asked

about the shooting and Dupere responded, in substance, that he believed that the shooting would

be deemed justified.  *See* Attachment A, ¶ 21.

11

**Pls. Resp.:** Admitted.

45.    Dupere's comment was based upon his prior conversation with the District Attorney. *See*

Attachment A, ¶ 21.

**Pls. Resp.:** Admitted, which further evidences the tainted, pre-judged nature of the investigation. [Cite: **Docket No. 77 at ¶¶** 48-49; **Exhibit M** at 20].

### IV.    THE DEPARTMENTAL PROCESSES FOLLOWING THE MASSACHUSETTS STATE POLICE INVESTIGATION AND THE DISTRICT ATTORNEY'S DETERMINATION

46.    Following the State Police investigation into the shooting, an investigation that, given the

circumstances, also included the arrests at the hospital of some of the decedent's friends and

family members; *see* Attachment A, ¶ 23; the District Attorney issued a twenty-one page report

detailing the investigation and announcing the determination that the inquiry had revealed

that the use of deadly force by Officer Nicholas Hoar was warranted under all of the

circumstances presented.  A copy of that report is appended hereto and designated as

"Attachment E[.]"

   **Pls. Resp.:** Qualified. Admitted that a report was issued, but Disputed that the use of deadly
   force was warranted. Physical evidence and accident reconstruction expert Donald Mong
   prove Hoar's narrative was physically impossible: Larry Ruiz-Barreto's left hand took the
   first round and his right humerus was shattered by two of the next three rounds, making it
   physically impossible for him to have shifted the vehicle into Park after the shooting. [Cite:
   **Exhibit W at 15-16**; **Docket No. 77 at ¶¶** 42-43, 53].

47.    Pursuant to Fall River Police Department policy, after an officer uses force in the

discharge of official functions, the officer is to complete a use of force form, which largely

consists of checking various boxes concerning the event.  *See* Attachment A, ¶¶ 43-44.

**Pls. Resp.:** Admitted.

48.    There is, however, a nuance in an instance in which an officer has potential criminal

12

exposure in that the officer has federal and state constitutional rights against self-incrimination and to act so as to compel the officer to make a statement, such as a threat of discipline for failure to abide by a directive to complete a use of force form, can impact the criminal investigation, including on issues of immunity and the admissibility of such a statement or the information contained in the statement. *See* Attachment A, ¶¶ 43-44.

**Pls. Resp.:** Objected to as offering legal conclusions rather than undisputed material facts. Disputed that this "nuance" justified the permanent failure of Officers Hoar and Correiro to ever file the mandatory Use of Defensive Tactics Report as required by FRPD Policy 41.2.2. and 1.3.6. [Cite: **Exhibit F** at 55; **Docket No. 77 at** ¶¶ 77 at 106].

49.     Accordingly, the preferred practice in such a situation is not to direct that an officer make a required statement demanded by policy, but for the criminal investigators to attempt to secure a voluntary interview. *See* Attachment A, ¶¶ 43-44.

**Pls. Resp.:** Disputed. Neither Hoar nor Correiro filed the mandatory Use of Defensive Tactics Report at any point, a clear violation of FRPD Policy 1.3.6 that Chief Dupere failed to enforce. [Cite: **Exhibit F** at 55; **Docket No. 77 at** ¶¶ 77 at 106].

50.     This type of scenario is accounted for by Fall River Police Department policy. Appended hereto and designated as "Attachment F" is Policy C02-12 of the Fall River Police Department, entitled "Written Directive System[.]" This policy states, among other things, that when a written authority of the Department needs to be deviated from either based upon application of common sense or any legal conflict, in which case the federal, state or local law trumps the Department's policy, deviation is authorized. *See* Attachment F, COFR 480.

**Pls. Resp.:** Admitted that the policy text exists, but Disputed that it exempts an officer from ever filing a use of force report following a fatal shooting. [Cite: **Exhibit F** at 55; **Docket No. 77 at** ¶¶ 77, 106].

13

51.    In this circumstance, because of the potential impact on the criminal investigation being conducted by the State Police, Officer Hoar was not ordered to submit a use of force form during the pendency of the State Police and District Attorney's investigation.  *See* Attachment A, ¶¶ 43-44.

**Pls. Resp.:** Admitted he was not ordered, which Plaintiffs contend demonstrates a deliberate failure to supervise and enforce policy. [Cite: **Docket No. 77 at ¶¶ 77, 106**].

52.    Instead, in conformity with an approach that would have rendered his statement admissible, Officer Hoar was requested by the State Police to participate in a voluntary, consensual interview.  *See* Attachment A, ¶¶ 43-44.

**Pls. Resp.:**  Admitted.

53.    Officer Hoar participated in that voluntary, consensual interview.  *See* Attachment A, ¶¶ 43-44.

**Pls. Resp.:**  Admitted.

54.    Once the State Police and District Attorney's investigation was completed some months later, there was no wisdom in directing that the use of force form be completed and boxes be checked at that point because the Department already had the lengthy recorded interview of Officer Hoar to evaluate.  *See* Attachment A, ¶¶ 43-44.

**Pls. Resp.:** Disputed. FRPD Policy mandates the completion of a Use of Defensive Tactics Report; the failure of Chief Dupere and Deputy Chief Furtado to enforce this requirement reflects systemic deficiencies in accountability and a tacit approval of misconduct. [Cite: **Exhibit F** at 55; **Docket No. 77 at ¶¶ 77, 106**].

55.    The plaintiffs themselves already have acknowledged in this litigation the prominence of this interview.  *See* Docket No. 107 at 1-2 (objection to defendant Hoar's motion to stay; referencing that Hoar had provided state, county and Fall River officials with "extensive

statements" that consist of a "lengthy[,] videotaped" interview).

56.     When the investigation of the Massachusetts State Police and the District Attorney's

Office was completed, then-permanent Chief Dupere reviewed the District Attorney's report.

*See* Attachment A, ¶ 22.

**Pls. Resp.:** Admitted.

57.     Contemporaneously with the close of the Massachusetts State Police and the District

Attorney's Office's investigation, the investigatory material, which included material related to

the hospital arrests that the State Police also had investigated, was provided to the Fall River

Police Department.  *See* Attachment A, ¶ 23.

**Pls. Resp.:** Admitted.

58.     Pursuant to policy, at that point in time a review for policy and rule compliance was

performed by a shooting investigation team.  *See* Attachment A, ¶ 24.  The policy provides that

the investigation team is comprised of a primary investigator from the Professional Standards

Unit, a supervisor from the involved officer's unit or division and a supervisor from the Major

Crimes Division.  *See* Attachment A, ¶ 24.

**Pls. Resp.:** Admitted as to the composition of the team, but Disputed that the review was
impartial or legitimate. The Board's entire review was conducted in just 12 minutes without a
single question asked, cementing the rubber-stamp nature of the investigation. [Cite: **Docket No.
77 at ¶¶** 49, 83-84, 206-207; **Exhibit Q**].

59.     In this instance, the shooting investigation team was comprised of Lieutenant Paul Santos

from Professional Standards, Lieutenant Ronald Furtado and Sergeant Thomas Mauretti.  *See*

Attachment A, ¶ 24.

**Pls. Resp.:** Admitted.

60.     A lengthy report summarizing the shooting investigation team's findings was prepared

and was endorsed by Lieutenants Santos and Furtado as well as Sergeant Mauretti.  A copy of the report is appended hereto and designated as "Attachment G[.]"

**Pls. Resp.:** Admitted that the report was prepared.

61.    The determination of the shooting investigation team was that there was no violation of any rule or procedure.  *See* Attachment G; *see also* Attachment A, ¶ 25.

**Pls. Resp.:** Disputed. The findings were fundamentally flawed. Officer Hoar blatantly violated felony car stop protocols and the specific mandate within FRPD Policy on moving vehicles which prohibits firing at a moving vehicle unless threatened by deadly force *other* than the vehicle itself. Captain Jay Huard testified that the Board ignored or was completely deprived of critical physical and testimonial evidence—such as the true 16-second timeline and the fact Hoar cross-blocked the Acura leaving "less than a foot" to move—before endorsing the unconstitutional procedure. [Cite: **Docket No. 261-7** at 1-2; **Docket No. 261-9** at 1; **Exhibit X** at 8-9; **Exhibit W at 15-16**; **Exhibit F** at 53; **Docket No. 261-26 at** 164-167; **Docket No. 77 at ¶¶** 38-41, 126, 206-207; **Exhibit M at** 42-43; **Exhibit P** at 38-45, 53-57].

62.    That does not conclude the evaluation as, pursuant to policy, the findings of the shooting investigation team are presented to a shooting review board.  *See* Attachment A, ¶ 26.

**Pls. Resp.:**  Admitted.

63.    The shooting review board is comprised of individuals who occupy various assignments within the Department as well as two members of the Department who are chosen by the officer involved in the shooting.  *See* Attachment A, ¶ 26.

**Pls. Resp.:**  Admitted.

64.    Prior to the shooting review board convening, members are provided with material related to the investigation for review.  *See* Attachment A, ¶ 27.

**Pls. Resp.:**  Admitted.

65.    The shooting review board was convened on April 23, 2018—appended hereto and designated as "Attachment H" is the sign-in sheet for the hearing.

**Pls. Resp.:**  Admitted.

66.     The shooting review board was chaired by Deputy Chief of Police Wayne Furtado.  *See* Attachment H.  Representing the Major Crimes Division was Lieutenant Jay Huard; representing the Uniform Division was its commanding officer Captain Paul Gauvin; representing the Planning and Training Division was Captain Michael Duarte; and the officer's choices were Officers Joseph Kubicek and Raul Camara.  *See* Attachment H.  Lieutenant Paul Santos was there for the Professional Standards Unit, as was Officer Nicholas Hoar and a recording secretary, Detective John Robinson.  *See* Attachment H.

**Pls. Resp.:**  Admitted.

67.     Following the hearing, the Chairperson, Deputy Chief Furtado, authored a report to Dupere indicating that the shooting review board had convened and, after a presentation from Lieutenant Santos, voted unanimously to concur with the shooting investigation team's findings. A copy of that report is appended hereto and designated as "Attachment I[.]"

**Pls. Resp.:** Admitted that the report was authored, but Disputed that the findings had factual merit. The Board actively affirmed the unconstitutional "cross-blocking" traffic stop procedure and endorsed a false narrative without a single board member asking a single question during the 12-minute meeting. [Cite: **Docket No. 261-7** at 1-2; **Docket No. 261-9** at 1; **Exhibit X** at 4-9; **Exhibit W at 15-16**; **Docket No. 77 at** ¶¶ 38-41, 206-207; **Exhibit M** at 27-28; **Exhibit P** at 14, 57].

68.     Deputy Chief Furtado recommended that Officer Nicholas Hoar, who had been on administrative leave, be returned to full duty.  *See* Attachment I.

**Pls. Resp.:**  Admitted.

69.     Dupere had reviewed the material himself and he concurred with both the shooting review board and the shooting investigation team's findings, which were consistent with the District Attorney and Massachusetts State Police determinations.  *See* Attachment A, ¶ 28; *see*

17

*also* Attachment I.

**Pls. Resp.:** Disputed. Dupere's concurrence represents a ratification of unconstitutional conduct. First, Plaintiffs explicitly object to the assertion that the Massachusetts State Police (MSP) made a "determination" justifying the shooting; MSP Lead Investigator Christopher Dolan testified unequivocally that DA Quinn acted as the "sole decisionmaker." Second, Dupere formally affirmed the unconstitutional "cross-blocking" traffic stop procedure and the physically impossible false narrative that led to Larry Ruiz-Barreto's death, exposing the City to Monell liability. [Cite: **Deposition of Christopher Dolan** at 15-16; **Docket No. 261-9** at 1; **Exhibit X** at 4-9; **Exhibit W at 15-16**; **Docket No. 77 at ¶¶** 38-41, 126, 206-207; **Exhibit M** at 27-30, 101; **Exhibit P** at 14, 57].

70.    Officer Nicholas Hoar then was returned to duty. *See* Attachment I.

**Pls. Resp.:**  Admitted.

## IV.    THE INDIVIDUAL DEFENDANTS' DEPARTMENTAL HISTORIES

71.    There remain in this action a total of fifteen (15) individual defendants.  Evidencing a system in place prior to the Department transitioning to digital recordkeeping, appended hereto and designated as "Attachment J" are the employment cards for each individual defendant, depicting various dates such as their appointments, promotions or separations.

**Pls. Resp. (to 71-156):** Admitted strictly as to the existence of the employment/disciplinary documents attached. However, Plaintiffs Dispute that these records absolve the City or Chief Dupere of Monell or supervisory liability, as they explicitly demonstrate an entrenched culture of impunity where officers repeatedly engaged in excessive force, including taser use, false reporting, and were protected by the City. Notably, Officer Pessoa and Officer Aubin fabricated police reports regarding the Charlton Hospital incident, and Officer DaLuz utilized deadly force (a baton strike to the head) without consequence. [Cite: **Docket No. 77 at ¶¶** 70, 73, 77-81, 95; **Exhibit X** at 4-9; **Exhibit T** at 5-7, 14, 47-49].

### A.    SEAN AGUIAR

72.    Aguiar was appointed as a Fall River police officer in March, 2016 and, after graduation

from the police academy, began a field training program period from October, 2016 to January, 2017.  *See* Attachment J, COFR 1686.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

73.     Prior to the November, 2017 events at issue here, Aguiar received a documented counseling in August, 2017 concerning retraining on identifying and classifying missing or suicidal persons as well as the chain of command for the submission of reports.  A copy of this counseling is appended hereto and designated as "Attachment K[,]" COFR 5078.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

74.     Years after the events at issue here, Aguiar received a two-day suspension and remedial training after he was found to have accessed criminal history information improperly and disseminated it.  Documentation as to that discipline is located within Attachment K at COFR 5169-70.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

75.     Aguiar was a named defendant in *LaFrance v. City of Fall River, et al.*, United States District Court for the District of Massachusetts Civil Action No. 22-10099-DJC.  Also named in that action were Michael Pessoa and Thomas Roberts.  The incident in that matter occurred in 2019, after the events at issue in this case, and concerned Pessoa's use of force and Aguiar and Roberts' reporting of the 2019 event.  Aguiar resigned from the Fall River Police Department in 2021 as a consequence.  *See* Attachment K, COFR 5184-86; *see also* Attachment D, COFR 11507; Attachment J, COFR 1686.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

19

**B.     ROSS AUBIN**

76.     Ross Aubin was appointed as a Fall River police officer in 2012, began his field training period in February of 2013 and finished his field training in May, 2013.  *See* Attachment J, COFR 1687.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

77.     Prior to November, 2017, Aubin was investigated based upon a complaint of abuse and unprofessional treatment in 2015.  Appended hereto and designated as "Attachment L" are records related to Aubin's history, with the investigation material related to this matter located at COFR 7543-7563.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

78.     After November, 2017, Aubin was issued a written reprimand in 2018 for making an arrest without properly confirming the existence of a warrant.  *See* Attachment L, COFR 7564-7577.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

79.     After November, 2017, Aubin was complained about as having used excessive force—there was an investigation and the allegation was determined to be unfounded.  *See* Attachment L, COFR 7578-7612.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

**C.     GREGORY BELL**

80.     Gregory Bell was appointed as a Fall River police officer in 1993, underwent a training period and then went to a police academy, graduating and beginning work in 1994.  *See* Attachment J, COFR 1688.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

81.     Bell was promoted to sergeant in 2004 and retired in July, 2021.  *See* Attachment J, COFR 1688.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

82.     In 2002, Bell received a one-day suspension for a cruiser accident and, in 2009, there was a sustained finding against him for knowledge of laws.  *See* Attachment J, COFR 1688; *see also* Attachment D, COFR 11514.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### D.     PETER DALUZ

83.     Peter DaLuz was appointed as a Fall River police officer in 2000, graduated from a police academy that year, began field training in December, 2000 and completed it in February, 2001.  *See* Attachment J, COFR 1690.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

84.     Prior to the events at issue here in November, 2017, DaLuz was the subject of a complaint of physical abuse, which was investigated and determined to be unfounded.  The investigatory material from that inquiry is appended hereto and designated as "Attachment M[,]" COFR 7613-7647.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### E.     JENNIFER DELEON

85.     Jennifer DeLeon was appointed as a Fall River police officer in March, 2017, went to a police academy and began her field training in October, 2017.  *See* Attachment J, COFR 1691.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

86.     Prior to the events at issue here, in September, 2017, DeLeon was the subject of an investigation based upon an allegation that a person she was with had shoplifted.  Appended

hereto and designated as "Attachment N[,]" COFR 7648-7667 is the investigatory material detailing that inquiry, for which DeLeon was exonerated of wrongdoing.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

87.    After the events at issue here, but relating to conduct before November, 2017, in 2019 DeLeon was reprimanded for conduct unbecoming for failing to disclose a prior shoplifting event during her background investigation.  *See* Attachment N, COFR 7786-7815.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

88.    Also after the events at issue here, in 2021 DeLeon was accused of having made a racial slur, which was investigated and determined not to be a sustained claim.  *See* Attachment N, COFR 7855-7869.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

89.    Postdating the events at issue here, DeLeon twice has been sanctioned for cruiser accidents.  *See* Attachment D, COFR 11529.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### F.    JOHN DESCHENES

90.    John Deschenes was appointed as a police officer for the Fall River Police Department in October, 2011 and he graduated out of his field training period in July, 2012.  *See* Attachment J, COFR 1692.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

91.    Prior to November, 2017, Deschenes received two- and three-day suspensions, both accounted for through the loss of accrued time, for cruiser accidents and he also received a five-day suspension.  *See* Attachment D, COFR 11390.  All of that discipline was in 2013.  *See id.*

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

92.     Also prior to November, 2017, Deschenes was exonerated from a claim of physical abuse by Chief Daniel Racine in 2016.  A copy of the investigatory material is appended hereto and designated as "Attachment O[,]" COFR 7941-51.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

93.     After November, 2017, Deschenes was exonerated in 2019 on a claim of excessive force; *see* Attachment O, COFR 7952-74; and exonerated in 2021 on a claim of mishandling evidence. *See* Attachment O, COFR 7975-8020.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

## G.     ALBERT DUPERE

94.     Some of Dupere's employment history already has been discussed.  *See* SOF, ¶¶ 21-27. In March, 2020, Dupere stepped down as Chief of Police and became a Deputy Chief of Police. *See* Attachment A, ¶ 10; *see also* Attachment J, COFR 1693-94.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

95.     Dupere received no discipline and there is no record of a complaint against him prior to November, 2017.  *See* Attachment J, COFR 1693-94; *see also* Attachments B, C and D.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

96.     After November, 2017, at the time that he was stepping down as Chief, Dupere received a five-day suspension from the Mayor of Fall River for violation of the City's alcohol policy and failing to behave reasonably when he operated a Department vehicle after consuming alcohol. The disciplinary notices are appended hereto and designated as "Attachment P[,]" COFR 10673-74.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

## H.     NICHOLAS HOAR

97.     Nicholas Hoar was appointed as a Fall River in 2016 after he was a police officer for the Massachusetts Bay Transportation Authority.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

98.     Prior to November, 2017, Hoar had been exonerated concerning two cruiser accidents and received a written reprimand as a result of another, all of which occurred in 2017.  *See* Attachment B, COFR 11401-11402, 11404; *see also* Attachment D, COFR 11543.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

99.     Also prior to November, 2017, Hoar was accused of physical abuse in April, 2017 and exonerated of the allegation by Dupere in June, 2017.  A copy of the investigatory material concerning that inquiry is appended hereto and designated as "Attachment Q[,]" COFR 1253-1315; *see also* Attachment B, COFR 11401.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

100.     After November, 2017, in February, 2019, an early warning system review activation was initiated for Hoar by Deputy Chief Wayne Furtado.  *See* Attachment Q, COFR 1367-1490.  The early warning review was triggered by the number of use of force reports filed Hoar in 2018 and triggered supervisory inquiry concerning the incidents.  *See id.*  The review culminated in a determination that the uses of force were appropriate, but training in deescalation for Hoar was recommended in any event.  *See id.*

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

101.     In 2020, there were three force complaints made against Hoar and he was exonerated in each, with the investigatory material within Attachment Q at COFR 1534-1685.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

24

102.    As a result of an incident involving the use of excessive force and reporting on force in December, 2020, Hoar was convicted criminally in federal court. *See United States v. Nicholas Hoar*, United States District Court for the District of Massachusetts Docket No.: 22-CR-10324-ADB. As a matter susceptible to notice, Hoar later resigned from the Department.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### I.    DAVID MCELROY

103.    David McElroy was appointed as a police officer in 2000 and retired in 2022. *See* Attachment J, COFR 1696.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

104.    In 2003, McElroy was required to work an extra duty day without pay for a cruiser accident and, in 2005, was given a one-day suspension for a cruiser accident. *See* Attachment D, COFR 11559; *see also* Attachment J, COFR 1696.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

105.    In 2013, McElroy was reprimanded for a cruiser accident; *see* Attachment D, COFR 11559; and he was again reprimanded for a cruiser accident in 2017. *See* Attachment B, COFR 11402.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

106.    In 2015 and again in 2017, McElroy was disciplined for sick leave abuse, losing a day of accrued time in each instance. *See* Attachment D, COFR 11559.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

107.    Prior to 2017, McElroy was investigated for: (1) abusive conduct in 2014, with the investigation exonerating him; a copy of the investigatory material is appended hereto and designated as "Attachment R[,]" COFR 8049-8078; (2) physical and verbal abuse in 2016, which

25

were found to be false accusations after an investigation; *see* Attachment R, COFR 8099-8110;

and, (3) physical abuse in 2016, with the finding of exoneration coming after the investigation.

*See* Attachment R, COFR 8110-8137.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

108.    After 2017, McElroy was exonerated of a rudeness complaint in 2019; *see* Attachment R,

COFR 8165-8236; and attending counseling based upon information that he might have

consumed marijuana while a police officer.  *See* Attachment R, COFR 8237-8250.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### J.    BRENDAN MCNERNEY

109.    Brendan McNerney was appointed as a Fall River police officer in 2014 and attended a

police academy; upon his graduation and commencement of work for Fall River, his field

training period was extended until a point in 2015 and his probationary period was extended until

2016.  *See* Attachment J, COFR 1697.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

110.    Prior to November, 2017, McNerney was:  (1) reprimanded for improper use of

Department property; *see* Attachment B, COFR 11383; *see also* Attachment D, COFR 11561;

and (2) disciplined twice for cruiser accidents.  *See* Attachment B, COFR 11398.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

111.    Also prior to November, 2017, McNerney was investigated and reprimanded in 2015,

along with Michael Pessoa, for transporting an individual for medical treatment by cruiser

instead of ambulance and improperly securing a weapon during booking.  A copy of the

investigatory material is appended hereto and designated as "Attachment S[,]" COFR 8251-

8270; *see also* Attachment B, COFR 11387.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

112.    In 2016, McNerney was suspended for one day because he had forced entry into the wrong home during a police response.  *See* Attachment S, COFR 8300-8329; *see also* Attachment B, COFR 11397; Attachment D, COFR 11561.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

113.    After November, 2017, McNerney was cleared of a harassment complaint; *see* Attachment S, COFR 8330-8359; and cleared of wrongdoing by an outside investigator in connection with his reporting of the event that resulted in Nicholas Hoar's federal criminal conviction.  *See* Attachment S, COFR 8360-8536.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### K.    DEREK OAGLES

114.    Derek Oagles was appointed as a Fall River police officer in 2011.  *See* Attachment J, COFR 1698.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

115.    In 2012, while in the academy, Oagles was reprimanded by Chief Racine for violation of academy rules.  Appended hereto and designated as "Attachment T[,]" COFR 8568-8571 is material related to that discipline.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

116.    In 2014, Oagles was cleared of an abuse claim arising out of an arrest and, in 2017, an allegation of harassment or unprofessionalism, made against Oagles and Thomas Roberts, was not sustained.  *See* Attachment T, COFR 8572-8613; *see also* Attachment B, COFR 11403.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

117.    In 2020, Oagles and Roberts were sued for excessive force relating to an incident that

was alleged to have occurred in August, 2017.  *See Ferreira v. Oagles, et al.*, United States District Court for the District of Massachusetts Docket No.:  20-11046-LTS.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### L.    TYLER PAQUETTE

118.    Tyler Paquette was appointed as a police officer in March, 2017 and, after the academy, began his field training period in October, 2017.  *See* Attachment J, COFR 1699.  Paquette resigned in May, 2022.  *See id.*

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

119.    Paquette was not the subject of a complaint or discipline prior to November, 2017.  *See id.*

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

120.    Paquette was reprimanded and retrained following a cruiser accident in 2018.  *See* Attachment D, COFR 11571.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### M.    MICHAEL PESSOA

121.    Michael Pessoa was appointed as a Fall River police officer in 2002.  *See* Attachment J, COFR 1700.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

122.    In 2002, while in the academy, Pessoa displayed a badge and told another motorist to keep moving during a verbal dispute between two drivers.  Appended hereto and designated as "Attachment U[,]" COFR 6170-71 is the material related to that reprimand.  *See also* Attachment D, COFR 11579.[2]

---

[2] For the sake of clarity, the documents within Pessoa's personnel file were out of order and these materials have been placed in chronological order for the Court's ease of reference.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

123.    Later in 2002, Pessoa was given a two-day suspension and had his probationary period extended for two months when, over the course of days, he failed to follow an order to remove blankets from cells, arrived to work unshaven and criticized a supervisor for chastising him, delayed a prisoner's medication dose, failed to follow an order on prisoner checks and was dishonest when a supervisor asked why and, lastly, because he failed to search a prisoner properly.  *See* Attachment U, COFR 6164-65 and 6598-6602; *see also* Attachment D, COFR 11579; Attachment J, COFR 1700.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

124.    In 2003, Pessoa was given one extra duty day without compensation following a cruiser accident.  *See* Attachment U, COFR 6163.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

125.    In 2003, Pessoa was reprimanded for policy violations concerning responsibilities and evidence.  *See* Attachment D, COFR 11579.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

126.    In 2004, Pessoa was suspended for two days and assigned two punishment duty days for failing to obey an order regarding the wearing of an earmuff-type headband.  *See* Attachment U, COFR 6142-43; *see also* Attachment D, COFR 11579; Attachment J, COFR 1700.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

127.    Also in 2004, Pessoa was suspended for a day for inappropriate and unprofessional conduct when he exchanged words with a citizen during a police response.  *See* Attachment U, COFR 6138, 6140-41; *see also* Attachment D, COFR 11579; Attachment J, COFR 1700.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

128.    Pessoa was suspended for a day as a result of a December 30, 2004 cruiser accident.  *See* Attachment U, COFR 6136; *see also* Attachment D, COFR 11579.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

129.    In 2005, Pessoa was suspended for three days for interacting with a physician at a hospital in an unprofessional way.  *See* Attachment U, COFR 6129, 6132; *see also* Attachment D, COFR 11579; Attachment J, COFR 1700.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

130.    In 2006, Pessoa was suspended for a day and given a punishment duty day when he failed to contact a supervisor at an accident scene, failed to issue a citation to a driver and failed to void and reissue a citation given, instead altering the citation.  *See* Attachment U, COFR 6122; *see also* Attachment J, COFR 1700.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

131.    Also in 2006, Pessoa was found responsible for a knowledge of laws policy violation and care for Department equipment—he was issued an extra duty day.  *See* Attachment D, COFR 11579.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

132.    In 2010, Pessoa was reprimanded for his conduct toward associates, again reprimanded in 2011 for a cruiser accident and, in 2012, ordered to counseling for improper conduct and reprimanded for a cruiser accident.  *See* Attachment D, COFR 11579-80.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

133.    In 2013, Pessoa was reprimanded for violation of the evidence and property policy and, in 2014, given a five-day suspension for conduct unbecoming.  *See* Attachment U, COFR 6148; *see also* Attachment D, COFR 11580.

30

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

134.    In 2015, Pessoa was reprimanded because a prisoner was transported by cruiser instead of ambulance and weapons were not secured properly during booking.  *See* Attachment U, COFR 6145-46; *see also* Attachment B, COFR 11387-88.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

135.    In 2016, Pessoa was sanctioned with the loss of an accrued day for sick leave abuse.  *See* Attachment D, COFR 11579; *see also* Attachment B, COFR 11397.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

136.    In 2016, a complaint of physical abuse by Pessoa, alleged to have occurred more than a decade before, was made; the professional standards investigator reviewed the report from the incident but notified the complainant that the investigation could not proceed further given the delay.  *See* Attachment U, COFR 6816-6824.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

137.    In 2016, an investigation into physical abuse by Pessoa was determined not to be sustained and a separate complaint of verbal and physical abuse was similarly concluded.  *See* Attachment U, COFR 6825-6920.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

138.    Physical abuse investigations in 2017 and 2018 also were determined to be unfounded. *See* Attachment U, COFR 6921-6971.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

139.    Prior to 2017, Pessoa was a defendant in federal civil rights cases in *Roque v. City of Fall River, et al.*, United States District Court for the District of Massachusetts Civil Action No.:  09-10572-GAO and *Roldan v. Pessoa*, United States District Court for the District of Massachusetts

Civil Action No.:  2017-10499.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

140.    In 2019, the Fall River Police Department was made aware of allegations of excessive force and false reporting in connection with an arrest of David LaFrance.  The Department conducted an investigation; *see* Attachment U, COFR 3385-3407; that culminated in Pessoa's termination from the Department.  *See* Attachment U, COFR 3439-3503.  Pessoa also was charged criminally and convicted of abuse and false reporting.  *See Commonwealth v. Pessoa*, Bristol County Superior Court Docket No.:  1973CR00182.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### N.    THOMAS ROBERTS

141.    Thomas Roberts was appointed as a Fall River police officer in 2012.  *See* Attachment J, COFR 1703.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

142.    In 2015, Roberts was reprimanded for violation of the policy on professional responsibility.  *See* Attachment B, COFR 11389.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

143.    In 2016, a complaint of conduct unbecoming was made against Roberts, but the allegations included a claim that Roberts had knocked a coffee cup out of the hand of an individual arguing with Roberts' father.  Appended hereto and designated as "Attachment V[,]" COFR 7284-7310 is the investigatory material concerning that inquiry.  Given the allegation, the Department referred the matter to the District Attorney's Office for potential prosecution, but it was declined.  *See id.*  Roberts was exonerated by Chief Racine, but with an articulated caveat that he was to be retrained on avoiding the appearance of favoritism.  *See id.*

32

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

144.    Roberts was disciplined for sick leave abuse in 2016 and again in 2017. *See* Attachment B, 11392, 11405.  The sanction was a loss of a personal day on each occasion. *See* Attachment D, COFR 11590.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

145.    After November, 2017, Roberts was disciplined in 2020 with a reprimand for having taking a picture of a crime scene. *See* Attachment V, COFR 7311-7329; *see also* Attachment D, COFR 11590.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

146.    Also after 2017, Roberts was involved in the LaFrance matter that led, among other things, to Pessoa's termination. *See* Attachment V, COFR 3429-3438.  The issue of Roberts' reporting of the incident led to his termination in 2022 as well. *See* Attachment V, COFR 3439-3440.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

147.    Roberts was a defendant in the *Ferreira* lawsuit alleging excessive force. *See* SOF, ¶ 117.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

### O.    MICHAEL SILVIA, JR.

148.    Michael Silvia, Jr. was appointed as a police officer for the City of Fall River Police Department in 1998. *See* Attachment J, COFR 1704.

**Pls. Resp.:** See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

149.    In 2009, Silvia was suspended for five days for insubordination and failure to submit reports. *See* Attachment D, COFR 11598.  The same year, Silvia was reprimanded for violation

of the Department equipment policy. *See* Attachment D, COFR 11598.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

150.    In 2009, Silvia faced three separate investigations concerning failure to submit reports and compliance with the evidence policy. *See* Attachment D, COFR 11598. The dispositions were combined and Silvia was issued a thirty-day suspension, with ten to be served, ten extra duty days worked and ten days held in abeyance, in addition to twelve counseling sessions. *See id.*

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

151.    In 2010, Silvia was reprimanded for calling out sick and, in 2011, was issued a sixty-day suspension for failure to submit reports. *See* Attachment D, COFR 11599.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

152.    In 2011, Silvia was issued a five-day suspension for sick leave abuse. *See* Attachment D, COFR 11599.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

153.    In 2016, Silvia was the subject of an investigation into allegations of physical abuse, verbal abuse and unlawful entry. After an investigation, the allegations were not sustained. Appended hereto and designated as "Attachment W[,]" COFR 8716-8879 is the investigatory material concerning that inquiry. *See also* Attachment B, COFR 11393.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

154.    A 2016 complaint by the Fire Chief into reporting resulted in an investigation and a finding of not sustained for Silvia. *See* Attachment W, COFR 8880-8939; *see also* Attachment B, COFR 11397-98.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

155.    After 2017, Silvia was reprimanded in 2018 for a cruiser crash and sent for retraining; lost a vacation day due to a separate cruiser crash in 2018; and, in 2020, was reprimanded and given policy retraining for violation of the police pursuit policy.  *See* Attachment D, COFR 11599.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

156.    Lastly, in 2022, Silvia became involved in an altercation with a coworker and, after an investigation, was disciplined with a two-day suspension.

**Pls. Resp.:**  See Plaintiffs' global response to paragraphs seventy-one through 156, supra.

## V.    THE MATERIAL TESTIMONY OF THE PLAINTIFFS' OWN EXPERT ON THE ISSUES OF SUPERVISORY AND MUNICIPAL LIABILITY

157.    The plaintiffs' identified "*Monell* expert" is George Kirkham, who was deposed in this matter.  A copy of his deposition transcript is appended hereto and designated as "Attachment X[.]"

**Pls. Resp.:**  Admitted.

158.    According to Dr. Kirkham, while he normally would review an officer's personnel file when asked to evaluate the officer and the officer's actions, he did not have nor review Hoar's personnel file here, although that is not a "major" issue for Dr. Kirkham.  *See* Attachment X, pp. 149-50; 165-67.

**Pls. Resp.:**  Admitted.

159.    In terms of what Dr. Kirkham did decide to read and evaluate, he testified that the written protocols of the Fall River Police Department are "solid" and "fine[.]"  Attachment X, p. 164.

**Pls. Resp.:** Admitted as to the written policies, but Disputed as to their enforcement. Dr. Kirkham testified that Hoar completely violated those solid protocols, specifically felony car stop and unknown risk procedures. [Cite: **Docket No. 261-26** at 164-167; **Exhibit X** at 8].

160.    Most critically for present purposes, Dr. Kirkham described that he has been able to identify "rogue" cops in Fall River through his evaluation and those officers include Michael Pessoa and Nicholas Hoar.  *See* Attachment X, pp. 82, 84.

**Pls. Resp.:**  Admitted.

161.    In fact, Dr. Kirkham went so far as to say that it would be "putting it mildly" to call Nicholas Hoar a rogue officer.  *See* Attachment X, p. 147.

**Pls. Resp.:**  Admitted.

161.[3] Perhaps even more critically, on his own initiative no less, Dr. Kirkham provided his opinion, repeatedly expressed, that the shooting of Larry Ruiz-Barreto was a murder and an execution.  *See* Attachment X, pp. 84, 150-51, 179.

**Pls. Resp.:**  Admitted.

162.    For Dr. Kirkham, "[i]n my mind, this is murder . . . ."  Attachment X, pp. 150-51.

**Pls. Resp.:**  Admitted.

163.    In response to a question eliciting what information, if any, Dr. Kirkham possessed that Nicholas Hoar was going to commit a murder in November, 2017, Dr. Kirkham testified, in pertinent part, ". . . no, to answer your question, I don't think, unless you had a crystal ball, that you would know that he—he went out there to do severe harm. . . ."

**Pls. Resp.:** Qualified. While Dr. Kirkham stated one cannot perfectly predict murder without a crystal ball, he testified extensively that Hoar's immediate, blatant violations of FRPD felony car stop policies and safe zone protocols foreseeably created the fatal encounter. [Cite: **Docket No.**

---

3 The original version of the statement of facts contained a typographical error with two paragraphs numbered 161.  That numbering is maintained given that the principal memorandum material relied upon that numbering and so as not to impact the number of the plaintiffs' additional statement.

**261-26** at 164-167; **Exhibit X** at 8].

---

**Plaintiffs' Additional Statement of Material Undisputed Facts[4]**

**A. Facts Surrounding the Stop and Shooting[5]**

164. Officer Nicholas Hoar did not normally work Sector 1 and just happened to take a shift there that weekend. Less than 24 hours prior to the shooting, Officer Hoar threatened youths from Brockton at a nearby Cumberland Farms, warning them never to return because his parents lived right there near the Cumberland Farms where they congregated, and he told them he was "sick and tired of listening to his parents complain about the noise." The Massachusetts State Police took two videotaped statements from the young men lectured at the Cumberland Farms parking lot. [Cite: **Exhibit I**; Exhibit **Docket No. 77 at ¶** 29].

**CITY'S RESPONSE:** Beyond immateriality for the City's motion, the content of this paragraph is not supported properly by the record citations and need not be considered by the Court. Although the plaintiffs unfortunately duplicated the City's labeling of exhibits, it is presumed that the citation to Exhibit I is to the plaintiffs' attachment and that contains only the interview of Mr. Oviedo. Additionally, the citation to Docket No. 77 is to an electronic order and it has to be assumed that the plaintiffs intended to cite to Docket No. 78, which is the operative second amended complaint. Citations to a complaint are insufficient at the summary judgment stage to support a factual statement. *See United States ex rel. Lokosky v. Acclarent, Inc.*, 675 F.Supp.3d 15, 20 n.3 (D.Mass. 2023) citing Fed.R.Civ.P. 56 (c) (1) (A).

Responding further, to the extent that this Court is inclined to consider the information despite the plaintiffs' presentation, Hoar disputed that there was any such confrontation prior to the night of the shooting. *See* Pl. Exhibit L, Docket No. 278-14 at 62-66. In addition, the Massachusetts State Police investigation retrieved surveillance video of the encounter among Hoar and others on November 11, 2017 and the video was consistent with Hoar's recitation of the nature of the interaction. *See* City Attachment E, Docket No. 261-5 at 6.

165. The two female witnesses who called 911 told dispatch that only 5 cars were present when they saw the green Honda hatchback smoking. [Cite: **Exhibit S** at 165; **Exhibit B**; **Docket No.**

---

[4] In keeping with the Court's desire for docket citations that enable ease of searches through Pacer, the City's record citations will be to the Pacer-supplied page numbering. It should be noted that, because the plaintiffs cite to the pages of the original source documentation and also used a cover page, the Pacer-supplied numbering differs from the plaintiffs' numbering.

[5] **CITY'S RESPONSE:** To the extent that the section headings in the plaintiffs' additional statements are intended to be recitations of fact, they are not supported by citations to the summary judgment record and ought not be considered, including because they frequently are argumentative, conclusory and otherwise improper.

**77 at ¶¶** 31-32].

**CITY'S RESPONSE:**  This statement is not supported by the record citations.  To begin, it is unknown why there is a reference to Exhibit S in this statement because neither the City's Attachment S nor the plaintiffs' Exhibit S have anything to do with this contention.  As to Pl. Exhibit B, Docket No. 278-4 at 7, the call log evidences that there were "alot [sic]" of cars in the area.  To the extent that the plaintiffs' citation to Docket No. 77 was intended to be a reference to the operative complaint at Docket No. 78, reference to a pleading is insufficient to support a factual statement at summary judgment.  *See* City Response to SOF, ¶ 164.

166. The FRPD did not know the proper protocol for a Priority 1 "shots fired" call, and performed a stop which resulted in the fatal encounter. The Priority 1 Call Log confirms the initial call came in at 23:38 reporting a smoking hatchback, and exactly 9 minutes later at 23:47, Officer Correiro called in "shots fired." [Cite: **Docket No. 77 at ¶¶** 104-105, 194-196; **Docket No. 261-26**; **Exhibit X** at 8; **Exhibit B**].

**CITY'S RESPONSE:**  The first sentence of this paragraph, in addition to being illogically worded concerning the notion of a municipal agency having sentient knowledge and performing a motor vehicle stop, is not properly supported by the record citations.  The reference to the operative complaint is improper.  *See* City Response to SOF, ¶ 164.  The reference to Docket No. 261-26 is without a pinpoint citation and Docket No. 261-26 is a 318-page deposition transcript. It is not the obligation of the Court nor is the obligation of the City to rummage through a transcript in the hope of finding what the plaintiffs might be referencing.

Further, there is no discussion on page eight of plaintiffs' Exhibit X to this issue.

Lastly, it is admitted that, according to the call log, the call for service first was entered at 23:47 and the shots fired call was made at 23:47.  *See* Pl. Exhibit B, Docket No. 278-4 at 7.

167. Following the shooting at 11:46 Officer Hoar and Officer Correiro both admitted that the Acura was floored after Larry was shot, but the Acura was not moving. [Cite: **Exhibit L at** 138; **Exhibit W at 15-16**].

**CITY'S RESPONSE:**  This statement is not supported by the record citations.  The two sources cited, the deposition transcript of Nicholas Hoar and the expert report of Donald Mong, do not discuss a time of 11:46, or any other time.  *See* Pl. Exhibit L, Docket No. 278-14 at 140; *see also* Pl. Exhibit W, Docket No. 278-25 at 16-17.  There is no reference in either exhibit to any statement by Correiro, nor is there an indication in either exhibit that the "Acura was floored[.]" *See* Pl. Exhibit L, Docket No. 278-14 at 140; *see also* Pl. Exhibit W, Docket No. 278-25 at 16-17.  In fact, the referenced section of Hoar's deposition indicates that there was little damage to his cruiser because the Acura was traveling at such a low rate of speed.  *See* Pl. Exhibit L, Docket No. 278-14 at 140.

168. It was physically impossible for Larry Ruiz-Barreto to have shifted the Acura into "Park" after the shooting because his left hand took the first round, and his right humerus took two of the next three rounds and was shattered into pieces. [Cite: **Docket No. 77 at ¶¶** 42-43, 53].

**CITY'S RESPONSE:** Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164. Further, there is no reliable methodology by which the sequencing of shots can be determined. It, however, is undisputed that the shots were fired into the vehicle from a position straight at the windshield. *See* Hoar SOF, Docket No. 279-1 at 25, ¶ 153 (with plaintiffs' admission).

169. Officer Hoar acknowledged that he did not touch the gear shifter because he had no idea if it was a standard or automatic transmission. [Cite: **Docket No. 268-2 at 33**; **Docket No. 77 at ¶¶ 42-43**].

**CITY'S RESPONSE:** Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

Responding further, this statement is not supported fully by the record citation. In the Nicholas Hoar interview located at Docket No. 268-2 at 33, Hoar said only that he did know if the car was a standard or not as he did not note it when he shut the car off. There is no reference to anything about the touching of a gear shifter in the record citation presented by the plaintiffs.

170. Officer Hoar never would have tried pulling Larry Ruiz-Barreto out of the Acura if it was floored and in gear. [Cite: **Docket No. 77 at ¶¶** 42, 51-53].

**CITY'S RESPONSE:** Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

171. It is physically impossible for the Acura to go from being parked and blocked in off the side of the roadway to somehow winding up out in the middle of the roadway in 5 seconds, especially when the Acura remained in Park. [Cite: **Exhibit W at 15-16**].

**CITY'S RESPONSE:** The record citation does not support the factual representation made by the plaintiffs in this paragraph.

172. Witnesses Jonathan Ruiz and Kathya Rodriguez-Otero testified regarding them watching the shooting from their Honda CRV parked immediately adjacent to the Acura. Both witnesses unequivocally testified that the Acura never moved at any point during the encounter. They fled the scene immediately after the shooting, leaving the Acura parked straight on the side of the road. When they returned on foot later, the Acura had been inexplicably moved and was now repositioned sideways/angled. [Cite: **Docket No. 77 at ¶¶** 42, 52; **Deposition of Kathya Rodriguez-Otero, Exhibit K** at 41, 48-50; **Deposition of Jonathan Ruiz, Exhibit N** at 40, 54-55].

**CITY'S RESPONSE:**  As directed by this Court in its April 3, 2026 Order, the City has made the edit to paragraph 172 requested by the plaintiffs.  *See* Docket No. 294.

Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

Rodriguez-Otero testified that, upon her return, the Acura was not in the position she recalled, but she also testified that she was hiding in the backseat of her vehicle and, at times, her attention was focused upon another officer when she could not make observations of what was occurring with the Acura.  *See* Pl. Exhibit K, Docket No. 278-13 at 41, 67-70.  Further, Ruiz testified that the Acura was situated differently when he returned, but the situation was not completed at the time of his departure.  *See* Pl. Exhibit N at 55-58.

173. The fact that this shooting occurred in a 5-6 second time window from the point in time where Allen Correiro stopped his police SUV is corroborated by multiple factors. The Massachusetts State Police determined from the security video at 1200 Airport Road that Correiro stopped exactly 10 seconds after Hoar. Correiro placed Hoar in front of the Acura's driver side. A large flame is observed on the security video 6 seconds later. This adds up to 16 seconds from Hoar stopping to the shooting. [Cite: **Exhibit W at 15-16**].

**CITY'S RESPONSE:**  This statement is not supported by the record citation, as Exhibit W, a report from Donald Mong, does not discuss these issues at these pages.  *See* Pl. Exhibit W, Docket No. 278-25 at 16-17.  In fact, quite to the contrary, the Mong report indicates that he believes the time period from initial stop to the initial shot being fired was approximately sixteen seconds.  *See* Pl. Exhibit W, Docket No. 278-25 at 16-17.

174. The police radio transmission from Hoar stating "street racers again" to the transmission of "shots fired" by Allen Correiro is exactly 17 seconds. [Cite: **Exhibit A**; **Exhibit W at 15-16**].

**CITY'S RESPONSE:**  This statement is not supported by the record citations.  Exhibit A is an audio recording with no authentication as to how the file was constructed with respect to time lapse.  *See* Pl. Exhibit A, Docket 278-3.  Exhibit W, the Mong report, absolutely does not support such a temporal period, as he indicates that he believes that there were approximately sixteen seconds from the stop to the first shot being fired.  *See* Pl. Exhibit W, Docket No. 278-25 at 16-17.

175. The Honda CRV that was parked at the passenger rear of the Acura is observed backing away from the shooting scene within 2 seconds of the flame (and 8 seconds after Correiro stopped, so the shooting occurred within these 8 seconds), and then fleeing up Airport Road. Kathya Rodriguez described this precise sequence to police investigators in 2017, but the plaintiffs did not receive the interview until several years later. [Cite: **Exhibit AA**; **Docket No. 77 ¶¶ 34, 42, 52**].

**CITY'S RESPONSE:**  Exhibit AA is a video and the Court can review what it does and does

not depict for itself. Assuming that the other citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

176. Officers Hoar and Correiro both claimed the Acura had its headlights on and turned left and swept Hoar's legs out, but the security camera shows zero Acura headlight movement. [Cite: **Exhibit AA**; **Docket No. 77 at ¶¶** 42, 52].

**CITY'S RESPONSE:** Exhibit AA is a video and the Court can review what it does and does not depict for itself. Assuming that the other citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

177. Officer Hoar admitted walking up to the A-pillar of the Acura. Hoar had a large safe area to his right as Officer Correiro's vehicle was stopped right there, and FRPD policy made it mandatory that Hoar step into this safe zone rather than shoot into the Acura. [Cite: **Docket No. 261-26**].

**CITY'S RESPONSE:** The reference to Docket No. 261-26 is without a pinpoint citation and Docket No. 261-26 is a 318-page deposition transcript. It is not the obligation of the Court nor is the obligation of the City to rummage through a transcript in the hope of finding what the plaintiffs might be referencing. This statement is not supported properly for purposes of summary judgment.

178. In performing the stop in this manner, Officer Hoar directly violated felony car stop and unknown risk protocols, as well as the explicit mandate within FRPD Use of Force Policy regarding moving vehicles. FRPD Policy clearly commands: "Firearms shall not be discharged at a moving or fleeing vehicle unless the officer or another person is currently being threatened with deadly force by means other than the moving vehicle," and further orders that "officers shall move out of the path of any oncoming vehicle instead of discharging a firearm at it." [Cite: **Docket No. 261-26** at 164-167; **Exhibit F** at 53].

**CITY'S RESPONSE:** This statement is not supported by the record citations. That portion of the Kirkham deposition cited is focused upon the fact, when the question posed actually was answered, that Kirkham did not review the personnel file of Hoar. *See* City Exhibit X, Docket No. 261-26 at 165-68.

Responding further, while the operative use of force policy did contain a general proscription concerning firing at a motor vehicle and moving out of the path of a vehicle instead of discharging a firearm at it; *see* Pl. Exhibit F, Docket No. 278-8 at 54; the policy also elsewhere stated that "[b]ecause there are an unlimited number of possibilities allowing for a wide variety of circumstances, no rule, standard operating procedure or regulation can offer definitive answers to every situation encountered in which the use of force is necessary." Pl. Exhibit F, Docket No. 278-8 at 5. The policy elsewhere authorizes the use of reasonable force based upon the

41

perspective of the officer and the use of deadly force when, among other times, an officer feels life is being threatened. *See* Pl. Exhibit F, Docket No. 278-8 at 5-7, 10, 12, 20, 54-55. These were portions of the policy analyzed by the District Attorney's Office in reaching its determination that Hoar's use of force was justified and in compliance with policy and the law. *See* City Exhibit E, Docket No. 261-5 at 18-20.

### B. Post-Shooting Ratification and Hospital Assault[6]

179. Immediately after Officer Hoar shot Larry Ruiz-Barreto six times, responding officers including Officer Bruce Oliveira inexplicably handcuffed the uninjured rear passenger of the Acura and secured him in the back of a police cruiser without incident, treating the surviving victims like criminals. Meanwhile, Larry's father, Dimex—who was sitting in the Acura when Larry was shot—was taken to FRPD. He was finally released and told Larry was at Charlton Hospital. [Cite: **Exhibit D** at 1; **Docket No. 77 at ¶¶** 1, 56-57].

**CITY'S RESPONSE:** This statement is not supported by the record citations. To begin, and assuming that the citation to Docket No. 77 in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

As to the citation to Exhibit D, that exhibit is a collection of police reports and Officer Bruce Oliveira's report indicates that he handcuffed a rear occupant of the vehicle and placed him in a cruiser until the scene could be secured. *See* Pl. Exhibit D, Docket No. 278-6 at 2. Other reports indicate that individuals, variously identified as potential suspects or witnesses, were brought to the Fall River Police Department for questioning. *See* Pl. Exhibit D, Docket No. 278-6 at 2-4. There is no reference in those records about a release or information about Charlton Hospital.

180. Upon arriving at Charlton Hospital around 1:56 a.m., the Ruiz family was informed of Larry's death. While the family was overcome with grief, a large group of FRPD officers launched a sudden, unprovoked, and coordinated attack on the family at approximately 2:06 a.m. At no point did any officer declare that the family members were under arrest before initiating physical violence. [Cite: **Exhibit T** at 2, 18-19].

**CITY'S RESPONSE:** This statement is not properly supported for purposes of summary judgment. Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information. Affidavits at summary judgment are required, among other things, to be based upon personal knowledge. *See* Fed.R.Civ.P. 56 (c) (4). Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported as to anything outside the

---

6 **CITY'S RESPONSE:** To the extent that the section headings in the plaintiffs' additional statements are intended to be recitations of fact, they are not supported by citations to the summary judgment record and ought not be considered, including because they frequently are argumentative, conclusory and otherwise improper.

personal knowledge of that plaintiff.

Even if the statement is to be considered as supported sufficiently, the statement is contradicted by the undisputed record. The hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46. Within that material, which documents the Fall River police personnel present as well as the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals. *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

181. During this unprovoked assault, Dimex Ruiz-Hernandez was grabbed, dragged into a hallway, and punched in the head and neck by Officers Derek Oagles and Thomas Roberts. From the hallway, Dimex witnessed Officer Michael Pessoa place his brother, Jonathan Ruiz, into a chokehold, strangling him until he turned purple. Dimex was forced to physically intervene and pull Pessoa's arm off his brother's neck to save his life. [Cite: **Exhibit T** at 18-19].

**CITY'S RESPONSE:** This statement is not properly supported for purposes of summary judgment. Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information. Affidavits at summary judgment are required, among other things, to be based upon personal knowledge. *See* Fed.R.Civ.P. 56 (c) (4). Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported as to anything outside the personal knowledge of that plaintiff.

Even if the statement is to be considered as supported sufficiently, the statement is contradicted by the undisputed record. The hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46. Within that material, which documents the Fall River police personnel present as well as the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals. *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

182. Simultaneously, Officer Peter DaLuz struck Jose Ruiz on the head with a police baton, an act constituting deadly force under FRPD policy, which resulted in a fractured skull. Officer Ross Aubin also repeatedly tased Jose while he was on the ground. [Cite: **Exhibit T** at 14, 27; **Exhibit F** at 37].

**CITY'S RESPONSE:** This statement is not properly supported for purposes of summary judgment. Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information. Affidavits at summary judgment are required, among other things, to be based upon personal knowledge. *See* Fed.R.Civ.P. 56 (c) (4). Interrogatory responses ought be treated

no different and this exhibit therefore is not properly supported as to anything outside the personal knowledge of that plaintiff.

Even if the statement is to be considered as supported sufficiently, the statement is contradicted by the undisputed record. The hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46. Within that material, which documents the Fall River police personnel present as well as the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals. *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

183. Furthermore, Officer Jonathan Deschenes restrained a family friend, Miguel Sanchez, on the ground, allowing Officer Pessoa to violently kick Miguel into unconsciousness. Pessoa also assaulted Dimex's wife, Leslie Lugo. [Cite: **Exhibit T** at 16, 27].

**CITY'S RESPONSE:** This statement is not properly supported for purposes of summary judgment. Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information. Affidavits at summary judgment are required, among other things, to be based upon personal knowledge. *See* Fed.R.Civ.P. 56 (c) (4). Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported as to anything outside the personal knowledge of that plaintiff.

Even if the statement is to be considered as supported sufficiently, the statement is contradicted by the undisputed record. The hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46. Within that material, which documents the Fall River police personnel present as well as the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals. *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

184. Despite 15 to 20 officers being present and either participating in or witnessing this brutal hospital assault, only 4 mandatory "Use of Defensive Tactics" reports were ever filed, a flagrant violation of FRPD Policy 1.3.6 designed to conceal the criminal conduct. Officers Tyler Paquette, Brendan McNerney, Jennifer DeLeon, and David McElroy all witnessed the violence and failed to intervene or file reports. [Cite: **Exhibit T** at 24-25, 27; **Exhibit F** at 55].

**CITY'S RESPONSE:** This statement is problematically misleading. Exhibit F is the Fall River Police Department policy concerning use of force. *See* Pl. Exhibit F, Docket No. 278-8. According to the plaintiffs' own citation, use of force reporting is required when, unsurprisingly, an officer uses force as defined in the policy. *See* Pl. Exhibit F, Docket No. 278-8 at 56. The policy relied upon by the plaintiffs, consequently, does not require use of force reporting for

44

officers either who allegedly "witnessed" or "failed to intervene" as stated by the plaintiffs.  *See* Pl. Exhibit F, Docket No. 278-8 at 56.

Further, Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information.  Affidavits at summary judgment are required, among other things, to be based upon personal knowledge.  *See* Fed.R.Civ.P. 56 (c) (4).  Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported as to anything outside the personal knowledge of that plaintiff.

Otherwise, the hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46.  Within that material, which documents the Fall River police personnel present as well as the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals.  *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

185. To cover up the assault, Officer Michael Pessoa and Officer Ross Aubin authored synchronized, fabricated police reports. Officer Aubin falsely claimed the family was yelling threats against officers in English to manufacture probable cause, despite the family speaking exclusively in Puerto Rican Spanish and Aubin subsequently admitting under oath that he does not speak or understand Spanish. [Cite: **Exhibit T** at 9-10, 47-49; **Docket No. 77 at ¶** 59].

**CITY'S RESPONSE:**  This statement is not properly supported for purposes of summary judgment.   Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information.  Affidavits at summary judgment are required, among other things, to be based upon personal knowledge.  *See* Fed.R.Civ.P. 56 (c) (4).  Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported as to anything outside the personal knowledge of that plaintiff.

Assuming that the other citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment.  *See* City Response to SOF, ¶ 164.

Even if the statement is to be considered as supported sufficiently, it is misleading.  Pessoa testified during his deposition that he speaks Portuguese fluently and knows some words or phrases in Spanish.  *See* Pl. Exhibit S, Docket No. 278-21 at 7-8, 103, 145.

Otherwise, the hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46.  Within that material, which documents the Fall River police personnel present as well as

the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals. *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

186. The police narrative further claimed the assault began because Jose Ruiz "spit" on Officer Thomas Roberts. However, security footage and Officer Roberts' own use of force report explicitly contradict this, making no mention of any spitting incident. [Cite: **Exhibit T** at 3, 47].

**CITY'S RESPONSE:**  This statement is not properly supported for purposes of summary judgment.  Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information.  Affidavits at summary judgment are required, among other things, to be based upon personal knowledge.  *See* Fed.R.Civ.P. 56 (c) (4).  Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported as to anything outside the personal knowledge of that plaintiff.

Even if the statement is to be considered as supported sufficiently, the statement is contradicted by the undisputed record.  The hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46.  Within that material, which documents the Fall River police personnel present as well as the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals.  *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

187. Officer Thomas Roberts was previously caught on security video with Officer Pessoa participating in the "famous David Lafrance beatdown," which resulted in Lafrance's false arrest on many charges, further establishing a clear pattern of collusive false reporting and Monell liability. [Cite: **Exhibit T** at 36-37].

**CITY'S RESPONSE:**  Denied, even beyond the argumentative nature of the statement.  As the plaintiffs would be expected to know, the incident involving David LaFrance occurred almost two years after the hospital arrests and, as a consequence, Pessoa and Roberts both were terminated for their actions.  *See* supra, SOF, ¶¶ 140, 146.

188. Furthermore, the police had no idea what the Ruiz family was saying leading up to and during the hospital assault because the family only spoke Spanish, and none of the involved police officers spoke the language. During the assault, Pessoa explicitly complained to Officer DeLeon about their inability to understand the family. [Cite: **Exhibit T** at 2, 34].

**CITY'S RESPONSE:**  This statement is not properly supported for purposes of summary judgment.  Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in the answers, that plaintiff makes assertions as to this incident without citation to the source of the information.  Affidavits at summary judgment are required, among other things, to be based

upon personal knowledge. *See* Fed.R.Civ.P. 56 (c) (4). Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported as to anything outside the personal knowledge of that plaintiff.

Even if the statement is to be considered as supported sufficiently, it is misleading. Pessoa testified during his deposition that he speaks Portuguese fluently and knows some words or phrases in Spanish. *See* Pl. Exhibit S, Docket No. 278-21 at 7-8, 103, 145.

Otherwise, the hospital defendants have moved separately for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 296 at 3-46. Within that material, which documents the Fall River police personnel present as well as the contingent of officers from other agencies, the summary judgment record is explained, a record that includes various of the plaintiffs engaging in crimes and, after an officer was spit at, the circumstances of the subsequent arrests of individuals. *See* Hosp. Def. SOF, Docket No. 296 at 3-46.

**C. Expert Witness Findings on Monell Liability and Physical Evidence[7]**

189. According to Plaintiffs' police practices expert Dr. George Kirkham, the FRPD maintained a custom of "cross-blocking" which avoided explicit prohibition and was formally endorsed by the Shooting Review Board. Dr. Kirkham concluded this custom caused the fatal shooting within 16 seconds. [Cite: **Exhibit X** at 8].

**CITY'S RESPONSE:** This statement is not supported properly for purposes of summary judgment. "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion." *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotation marks omitted). Here, the Kirkham report cites to no suggestion that "cross-blocking[,]" as he terms it, was used in any instance other than this situation and cites to no suggestion that Hoar believed the Acura was anything other than unoccupied when he parked his cruiser. *See* Pl. Exhibit X, Docket No. 278-26.

Hoar separately has moved for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 295. Within that material, the sequence of events leading to the shooting is explained with references to the summary judgment record, including what led to the shooting. *See* Docket No. 295 at 7-17.

190. Dr. Kirkham further concluded that the FRPD's 5-year Internal Affairs retention policy intentionally purged records to prevent pre-2017 pattern evidence of misconduct. This demonstrated a custom of lenient internal affairs investigations, biased assignments, and a failure

---

7 **CITY'S RESPONSE:** To the extent that the section headings in the plaintiffs' additional statements are intended to be recitations of fact, they are not supported by citations to the summary judgment record and ought not be considered, including because they frequently are argumentative, conclusory and otherwise improper.

to discipline rogue officers like Michael Pessoa and Nicholas Hoar. [Cite: **Exhibit X at 4-9**].

**CITY'S RESPONSE:**  Disputed.  As evidenced by earlier statements of fact, the City has presented documentation concerning investigations and disciplinary responses to those investigations stretching back decades.  *See* supra, SOF, ¶¶ 18-20, 71-156.  Further, given Kirkham's report, which does not reveal the review of material that would support this opinion; *see* Pl. Exhibit X, Docket No. 278-26; this information as stated is inadmissible and may not be considered at summary judgment.  *See* Fed.R.Evid. 702 (b).

191. Plaintiffs' accident reconstruction expert, Donald Mong, concluded that it was physically impossible for the Acura to have moved as described by Officer Hoar, given the physical evidence and the 16-second timeline from Hoar's arrival to the shooting. [Cite: **Exhibit W at 15-16**].

**CITY'S RESPONSE:**  Hoar separately has moved for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 295. Within that material, the sequence of events leading to the shooting is explained with references to the summary judgment record, including what led to the shooting.  *See* Docket No. 295 at 7-17.  Further, for purposes of the City, the Mong opinion was not presented until years after the shooting.  At the time of City review of the shooting, the operative outside opinion was provided in some measure by the District Attorney's determination based upon the State Police investigation.  *See* City Exhibit E, Docket No. 261-5.

192. Expert Donald Mong determined that the post-shooting engine revving under full throttle without vehicle movement critically confirms that the Acura remained in "Park" and stationary throughout the entire encounter, and that Larry Ruiz-Barreto had his hands raised in a defensive posture when he was shot. [Cite: **Exhibit W at 15-16**]. Dr. Alexander Chirkov also testified to a reasonable degree of medical certainty that the vehicle remained stationary in Park throughout the shooting based on the trajectory and grouping of the bullet wounds. [Cite: **Deposition of Dr. Alexander Chirkov, Exhibit Y** at 107-108].

**CITY'S RESPONSE:**  Hoar separately has moved for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 295. Within that material, the sequence of events leading to the shooting is explained with references to the summary judgment record, including what led to the shooting.  *See* Docket No. 295 at 7-17.  Further, for purposes of the City, the Mong and Chirkov opinions were not presented until years after the shooting.  At the time of City review of the shooting, the operative outside opinion was provided in some measure by the District Attorney's determination based upon the State Police investigation.  *See* City Exhibit E, Docket No. 261-5.

193. The windshield glass bullet holes were correctly numbered 1-6 by the Massachusetts State Police. The glass fracture lines demonstrate that the first bullet went through the top of the windshield and struck Larry Ruiz-Barreto in the back of his left hand as he covered his face to block the first round, while two of the next three rounds shattered his right humerus . [Cite:

**Expert Report of Dr. Alexander Chirkov, Exhibit U** at 3; **Deposition of Dr. Alexander Chirkov, Exhibit Y** at 60-63, 136-137].

**CITY'S RESPONSE:**  This statement is not supported properly for purposes of summary judgment.  "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion."  *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotation marks omitted).  There is nothing in the Chirkov report or deposition testimony that can corroborate anything other than the State Police numbering of bullet holes in the windshield were anything other than a sequential ordering based upon presentation, which just as easily could have been accomplished in the reverse order, for example.

Hoar separately has moved for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 295.  Within that material, the sequence of events leading to the shooting is explained with references to the summary judgment record, including what led to the shooting.  *See* Docket No. 295 at 7-17.  Further, for purposes of the City, the Chirkov opinion was not presented until years after the shooting.  At the time of City review of the shooting, the operative outside opinion was provided in some measure by the District Attorney's determination based upon the State Police investigation.  *See* City Exhibit E, Docket No. 261-5.

194. Dr. Alexander Chirkov testified and concluded that the medical examiner found Larry Ruiz-Barreto was turned completely facing the driver's side window when rounds 2-6 entered his body. The first shot struck his left hand while it was raised above his head, and there is no other physical way the round could have entered the back of his left hand as he was turned away and facing the driver door window after that first shot. Dr. Chirkov further testified that the shots to the right humerus incapacitated his right arm. [Cite: **Exhibit U** at 3; **Exhibit Y** at 60-63, 68, 136-137].

**CITY'S RESPONSE:**  This statement is not supported properly for purposes of summary judgment.  "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion."  *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotation marks omitted).  There is nothing in the Chirkov report or deposition testimony that can corroborate anything other than the State Police numbering of bullet holes in the windshield were anything other than a sequential ordering based upon presentation, which just as easily could have been accomplished in the reverse order, for example.

Hoar separately has moved for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 295.  Within that material, the sequence of events leading to the shooting is explained with references to the summary judgment record, including what led to the shooting.  *See* Docket No. 295 at 7-17.  Further, for purposes of the City, the Chirkov opinion was not presented until years after the shooting.  At the time of City review of the shooting, the operative outside opinion was provided in some measure by the District Attorney's determination based upon the State Police investigation.  *See* City Exhibit E, Docket No. 261-5.

49

195. This defensive posture was corroborated in large part by backup Officer Allen Correiro, who told investigators during his November 16, 2017 interview that Larry had his hands up trying to cover his face when he was fired upon. [Cite: **Allen Correiro Interview Nov 16, 2017, Docket No. 268-4** at 44].

**CITY'S RESPONSE:**  This statement is not supported as stated by the record citation.  In the interview transcript for Allen Correiro, he describes his attention being drawn to the sounds of the shots being fired, at which point he observed an occupant of the vehicle raising his hands up after and while shots were being fired, not, as this statement suggests, prior.  *See* Docket No. 268-4 at 44-45.

196. Witness Kathya Rodriguez-Otero explicitly testified that immediately prior to and at the time the officer started shooting, she observed the occupants of the Acura and that they all had their hands raised up in the air. [Cite: **Exhibit K** at 56-57]. Furthermore, Jonathan Ruiz corroborated this defensive posture, testifying that as the officer was shooting, he saw the passenger, Dimex Ruiz, with his hands going back before dropping to the floor. [Cite: **Exhibit N** at 36].

**CITY'S RESPONSE:**  The plaintiffs accurately cite to the deposition testimony of these individuals.  *See* Pl. Exhibit K, Docket No. 278-13 at 57-58 and Pl. Exhibit N, Docket No. 278-16 at 37.

Responding further, Ms. Rodriguez-Otero told State Police investigators something different, namely, that she was blocked at times from making observations and she saw "someone" raise arms in the air.  *See* Docket No. 261-5 at 13.  Further, Ruiz did not cooperate with the State Police investigation but his attorney told investigators that he was not present for the event.  *See* Docket No. 261-5 at 14.  That was the information known to the City at the time of the internal review from these individuals.

197. Officer Allen Correiro testified at his deposition that Officer Hoar was standing in front of the Acura on the driver's side, and that Hoar started shooting in about "5 seconds." [Cite: **Deposition of Allen Correiro, Exhibit J** at 49].

**CITY'S RESPONSE:**  This statement is not supported by the record citation.  There is no discussion on this page of Hoar's positioning relative to the Acura.  *See* Pl. Exhibit J, Docket No. 278-12 at 51.  In terms of the representation of timing, Correiro specifically testified that he could not given an exact temporal period and was specifically asked for a "guess" on the timing. *See* Pl. Exhibit J, Docket No. 278-12 at 50-51.

198. While Officer Hoar testified that he walked up to the A-pillar of the Acura in an attempt to talk to the driver before any shooting, due to the 1.5 second perception / reaction time, it is physically impossible for Hoar to do anything but walk up and immediately start shooting within that 5-second window. [Cite: **Exhibit J** at 49; **Exhibit W at 15-16**].

**CITY'S RESPONSE:**  This statement is not supported by the record citation.  Please see the City's response to SOF, ¶ 197 for the discussion as to the Correiro guess on timing.  Further, the

50

Mong report as cited does not discuss this issue, including any claimed 1.5 second perception/reaction time, as described in this representation by the plaintiffs.  *See* Pl. Exhibit W, Docket No. 278-25 at 16-17.

199. The City of Fall River and Chief Dupere explicitly ratified Officer Hoar's actions and adopted a narrative that conflicted with the physical, forensic, and testimonial evidence (including Dr. Chirkov's findings on the defensive wounds and Correiro's admission of the 5-second timeline). Dr. Kirkham concluded that this deliberate endorsement of the sequence of events demonstrates a custom of cover-ups and a failure to discipline officers for the use of deadly force. [Cite: **Exhibit U** at 3; **Exhibit X at 4-9**; **Exhibit W at 15-16**; **Exhibit M** at 101].

**CITY'S RESPONSE:**  This is legal argument, not a statement of fact.  Nonetheless, please see the City's response to SOF, ¶ 197 for a discussion about Correiro's "admission" and SOF, ¶¶ 18-20, 71-156 for the documented disciplinary histories of officers over the course of years.  In terms of officers' use of deadly force, the plaintiffs have not cited to another instance of the use of deadly force and, according to the theory of their proffered expert, they have not pointed to a custom of "murder" by Fall River officers.  *See* supra, SOF, ¶ 162.

**D. Further Evidence of Physical Impossibility and Monell Ratification[8]**

200. Both Officer Hoar and Officer Correiro drew diagrams depicting the position of the Acura as they arrived, showing how Officer Hoar "cross-blocked" the vehicle. The Acura was facing straight north and was parked off the side of the roadway. [Cite: **Docket No. 77 at ¶¶** 38-41; **Exhibit C**; **Exhibit X at 4-9**].

**CITY'S RESPONSE:**  Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment.  *See* City Response to SOF, ¶ 164.

While it is unknown why this statement cites to the Kirkham report in that it purports to focus upon diagrams created by Hoar and Correiro; *see* Pl. Exhibit X, Docket No. 278-26; Pl. Exhibit C, Docket No. 278-5 contains the diagrams drawn by Correiro and Hoar.

201. Officer Hoar admitted to investigators that because of this maneuver, the Acura had "less than" a foot of space to move. Jonathan Ruiz confirmed that the police vehicle pulled right in front of the Acura, entirely blocking it from pulling forward. He further testified that because the police cruiser blocked the path, he had to put his CRV in reverse to navigate around the scene to flee. [Cite: **Docket No. 268-2**; **Exhibit W at 15-16**; **Exhibit N at** 36, 45].

**CITY'S RESPONSE:**  It is unclear as to why there is a citation to the Mong report here, as the

---

8 **CITY'S RESPONSE:**  To the extent that the section headings in the plaintiffs' additional statements are intended to be recitations of fact, they are not supported by citations to the summary judgment record and ought not be considered, including because they frequently are argumentative, conclusory and otherwise improper.

statement purports to derive from statements made by Hoar and Ruiz.

As to the citation to Docket No. 268-2, the interview of Hoar, the plaintiffs provide no pinpoint citation within a forty-page transcript.  That said, during the interview, Hoar was asked for the distance between the Acura and his cruiser when the Acura jolted forward and he indicated less than a foot.  *See* Docket No. 268-2 at 17-18.

As to the Ruiz testimony, this statement mischaracterizes his testimony.  Ruiz testified that he put his vehicle into reverse prior to leaving but did not testify that he did so "because the cruiser blocked the path" for him.  *See* Pl. Exhibit N, Docket No. 278-16 at 37, 46.  Ruiz testified that the cruiser did block the Acura.  *See* Pl. Exhibit N, Docket No. 278-16 at 37, 46.

202. The Massachusetts State Police, utilizing security footage from 1200 Airport Road, established that Officer Correiro's vehicle stopped exactly 10 seconds behind Officer Hoar's vehicle. [Cite: **Exhibit W at 15-**16].

**CITY'S RESPONSE:**  This statement is not supported by the record citation.  There is no discussion of such information on the cited pages.

203. Both in 2017 and during his sworn 2024 deposition, Officer Hoar testified that the Acura's headlights only turned on after he had exited his police SUV. [Cite: **Docket No. 77 at ¶¶ 42, 52**].

**CITY'S RESPONSE:**  Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment.  *See* City Response to SOF, ¶ 164.

204. Kathya Rodriguez-Otero and Jonathan Ruiz both testified that Officer Hoar arrived, immediately exited his vehicle with his gun already drawn in his hand, walked up to the fender/front of the Acura, and started rapidly firing his weapon. [Cite: **Exhibit K at** 39, 41, 43; **Exhibit N at** 35, 44-45].

**CITY'S RESPONSE:**  The plaintiffs somewhat accurately cite to the general deposition testimony of these individuals.

Responding further, Ms. Rodriguez-Otero told State Police investigators that she was blocked at times from making observations.  *See* Docket No. 261-5 at 13.  Further, Ruiz did not cooperate with the State Police investigation but his attorney told investigators that he was not present for the event.  *See* Docket No. 261-5 at 14.  That was the information known to the City at the time of the internal review from these individuals.

205. During his November 16, 2017 videotaped interview and his November 13, 2023 sworn deposition, Officer Correiro testified that Officer Hoar was already standing in front of the driver's side of the Acura when Correiro brought his vehicle to a stop. [Cite: **Docket No. 268-4** at 28-30; **Exhibit J** at 27].

52

**CITY'S RESPONSE:** This statement is not supported by the record citations. Neither the portions of the Correiro interview transcript cited nor the cited portion of the Correiro deposition transcript describe this information. *See* Docket No. 268-4 at 29-31; *see also* Pl. Exhibit J, Docket No. 278-12 at 29.

206. During his 2023 deposition, equipped with the knowledge that the Plaintiffs possessed the MSP video analysis placing his stop 10 seconds after Hoar, and the video of the Honda CRV backing away 8 seconds after Correiro stopped, Officer Correiro was forced to admit under oath that Officer Hoar was shooting about "5 seconds" after Correiro stopped. [Cite: **Exhibit J** at 49].

**CITY'S RESPONSE:** This statement is misleading and also is not supported by the record citation. There is no discussion in and around this portion of the Correiro deposition transcript about Correiro being "equipped" with knowledge about the plaintiffs' information. *See* Pl. Exhibit J, Docket No. 278-12 at 50-51. Further, Correiro specifically testified that he could not given an exact temporal period and was specifically asked for a "guess" on the timing. *See* Pl. Exhibit J, Docket No. 278-12 at 50-51.

207. In 2017 and 2024, witness Kathya Rodriguez stated that the occupants of the Honda CRV (parked near the Acura) were terrified to move because Officer Hoar had his gun out, and that they only backed away after Hoar opened fire on the parked Acura, as they were terrified they were about to be gunned down next. [Cite: Exhibit K, 41,76; **Docket No. 77 at ¶¶** 34, 42, 52].

**CITY'S RESPONSE:** Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

As to the citation to the Rodriguez transcript, Rodriguez testified that there was a second officer, not Hoar, who pointed his gun at her car. *See* Pl. Exhibit K, Docket No. 278-13 at 34, 77.

208. Dimex Ruiz, the father of the decedent and an occupant of the Acura, testified that Officer Hoar leaned over the driver's side hood with his left hand and simply opened fire on his son. [Cite: **Deposition of Dimex Ruiz-Hernandez, Exhibit O** at 70, 83; **Exhibit O** at 110; **Docket No. 77 at ¶¶** 1, 42, 53; See also **Exhibit BB**]

**CITY'S RESPONSE:** Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment. *See* City Response to SOF, ¶ 164.

Responding further, there is no page 110 of Exhibit O. *See* Pl. Exhibit O, Docket No. 278-17.

Otherwise, this statement generally captures this plaintiff's testimony, which would be in line with the plaintiffs' proffered expert thought that this was a murder. *See supra*, SOF, ¶ 162. That said, there is countervailing evidence. Hoar separately has moved for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is

referred to the amended statement of facts concerning that motion practice, now located at Docket No. 295. Within that material, the sequence of events leading to the shooting is explained with references to the summary judgment record, including what led to the shooting. *See* Docket No. 295 at 7-17. The District Attorney and Massachusetts State Police also found the shooting justified. *See* Docket No. 261-5.

209. Officer Correiro admitted he had no idea how Officer Hoar wound up on the hood of the Acura. Furthermore, due to the angle and firmness of the handprint on the hood, it is physically impossible that it was placed there by a person being "swept" onto the vehicle. Dr. Alexander Chirkov testified that it is practically impossible for the shooter to have been on the hood of the car, and that the shooter was standing on the left side of the car firing perpendicularly into the windshield. [Cite: **Exhibit W at 15-16**; **Exhibit Y** at 49, 93-94, 102-106].

**CITY'S RESPONSE:** The first sentence of this paragraph is without support in the material cited and therefore need not be considered.

Hoar separately has moved for summary judgment and, for the convenience of the Court and to avoid the repetition of pages of material, the Court is referred to the amended statement of facts concerning that motion practice, now located at Docket No. 295. Within that material, the sequence of events leading to the shooting is explained with references to the summary judgment record, including what led to the shooting. *See* Docket No. 295 at 7-17. The District Attorney and Massachusetts State Police also found the shooting justified. *See* Docket No. 261-5.

210. Upon careful magnification of the security video, Plaintiffs observed a large flash in the 3rd frame of the 37:08 mark. This occurs exactly 6 seconds after Officer Correiro stopped, and 2 seconds before the Honda CRV backs away. While the video captures only 3 frames per second (missing the millisecond gunfire flashes), Officer Correiro explicitly explained to investigators on November 16, 2017, that he observed a large "fireworks type display" as Hoar fired into the Acura. [Cite: **Exhibit W at 15-16**; **Docket No. 268-4** at 43].

**CITY'S RESPONSE:** This statement is unsupported by the record citations. There is no discussion of such a timeline or the other information provided within this paragraph in the Mong report. *See* Pl. Exhibit W, Docket No. 278-25 at 16-17. Further, while there is a quotation attributed to Correiro in this paragraph, that quotation does not appear in the source. *See* Docket No. 268-4 at 44. Rather, Correiro said that he shots simply looked like fireworks. *See* Docket No. 268-4 at 44.

211. This exceptionally tight timeline is definitively corroborated by police radio transmissions, which span exactly 17 seconds from Officer Hoar stating "street racers again" to Officer Correiro stating "shots fired." [Cite: **Exhibit A**; **Exhibit W at 15-16**].

**CITY'S RESPONSE:** This statement materially duplicates SOF, ¶ 174.

This statement is not supported by the record citations. Exhibit A is an audio recording with no authentication as to how the file was constructed with respect to time lapse. *See* Pl. Exhibit A, Docket 278-3. Exhibit W, the Mong report, absolutely does not support such a temporal period,

as he indicates that he believes that there were approximately sixteen seconds from the stop to the first shot being fired.  *See* Pl. Exhibit W, Docket No. 278-25 at 16-17.

212. On November 16, 2017, Officer Correiro physically demonstrated to investigators how the decedent had his hands up trying to protect his head while being fired upon. This matches the accounts of civilian witnesses who stated Larry had his hands up when he was shot to death. [Cite: **Docket No. 268-4** at 44; **Docket No. 77 at ¶¶** 42, 52].

**CITY'S RESPONSE:**  This statement is not supported as stated by the record citation.  In the interview transcript for Allen Correiro, he describes his attention being drawn to the sounds of the shots being fired, at which point he observed an occupant of the vehicle raising his hands up after and while subsequent shots were being fired.  *See* Docket No. 268-4 at 44-45.

Assuming that the other citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment.  *See* City Response to SOF, ¶ 164.

213. Monell Liability: Both Officer Nicholas Hoar and Officer Michael Pessoa subsequently criminally prosecuted and convicted for excessive force and false reporting. Dr. Kirkham cited these prosecutions as evidence of an entrenched custom of misconduct within the FRPD. [Cite: **Docket No. 77 at ¶¶** 59, 70-81, 95; **Exhibit X at 4-9**; **Exhibit M** at 123].

**CITY'S RESPONSE:**  Assuming that the citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment.  *See* City Response to SOF, ¶ 164.

As to the citation to Exhibit M, the plaintiffs' presentation is a mess.  Within Exhibit M, the plaintiffs present two different days of deposition transcript for Albert Dupere and, because they used copies previously filed with the Court, the Pacer-supplied numbering is entirely illegible for the entirety of the first day of the deposition.  Further muddling matters, the transcript that the plaintiffs used for day two of the transcript does not match page-for-page the Pacer pagination, meaning there are deposition pages that do not line up with the Pacer pages.  Focusing on the plaintiffs' citation to page 123, which appears directed to day two of the transcript, that and the preceding and succeeding pages reveal only that Dupere, while he could not think of a particular case, knew that officers' uses of force had been found unjustified by the Department and that both Hoar and Pessoa were prosecuted for unjustified uses of force.  *See* Pl. Exhibit M, Docket No. 278-15 at 136-38.

Lastly, as to the plaintiffs' citation to the Kirkham opinion, earlier statements have demonstrated the City's investigatory and disciplinary responses concerning officers, including all officers named as defendants here, over the years.  *See* supra, SOF, ¶¶ 18-20, 71-156.

214. Despite the physical impossibilities of Hoar's narrative, the 17-second radio timeline, and Correiro's admission of the 5-second shooting window, the City of Fall River deliberately

ratified Officer Hoar's actions. Dr. Kirkham concluded this demonstrates a systemic failure to discipline rogue officers. [Cite: **Docket No. 77 at ¶¶** 59, 70-81, 95; **Exhibit X at 4-9**; **Exhibit M** at 101].

**CITY'S RESPONSE:**  Assuming that the other citation to the record in this paragraph was intended to be Docket No. 78, the operative complaint, and not the electronic order located at Docket No. 77, this statement cites only to a pleading, which is insufficient to support a factual proposition at summary judgment.  *See* City Response to SOF, ¶ 164.

The statement's citation to Exhibit M is practically problematic for the reasons discussed in the City's response to SOF, ¶ 213.  It would appear, although the Pacer-supplied numbering cannot be deciphered easily, that the plaintiffs point to that portion of the Dupere transcript that indicates he agreed with the Shooting Review Board's recommendation.  *See* Pl. Exhibit M, Docket No. 278-15 at 102.  That page, however, does not contain any of the information contained within the first sentence of this paragraph.

Otherwise, and including in the citation to Exhibit X, this is not a proper statement of fact, but it is a legal argument made by plaintiffs' counsel.  In response, for the reasons discussed in this statement and the defendants' motion material, there was no deliberate ratification of misconduct.  As the District Attorney and State Police concluded, the shooting was justified.  *See* Docket No. 261-5.

215. During his October 22, 2024 deposition, Captain Jay Huard—a voting member of the Shooting Review Board—testified regarding multiple critical issues that were either ignored by or entirely concealed from the Board before they ruled that Officer Hoar did not violate any rules, policies, or procedures. Specifically, Captain Huard admitted the Board was never presented with the 16-second total timeline, Officer Correiro's "5 seconds" admission, the fact that Hoar cross-blocked the Acura leaving "less than a foot" to move, the actual security video (only selective screenshots), or the physical evidence of Hoar's stationary left handprint on the hood. [Cite: **Deposition of Jay Huard, Exhibit P** at 38-45, 53-57].

**CITY'S RESPONSE:**  This statement is not supported by the record citation as there is no such admission or discussion about the topics as described in this statement in the transcript at these pages.  *See* Pl. Exhibit P, Docket No. 278-18 at 40-47, 55-59.

216. Furthermore, a subsequently discovered audio recording of the Shooting Review Board meeting revealed that the entire proceeding to review the fatal shooting lasted a mere 12 minutes. Not a single member of the Board asked a single question before unanimously finding that Officer Hoar did not violate anything, which Dr. Kirkham identified as a custom of rubber-stamping uses of force. [Cite: **Exhibit Q**].

**CITY'S RESPONSE:**  This statement is not supported entirely by the record citation.  This statement cites only to an audio recording of the meeting; *see* Pl. Exhibit Q, Docket No. 278-19; and, consequently, the last clause of the second sentence regarding Kirkham's opinion is without any citation to the record.  Further, as the plaintiffs have admitted, the shooting review board members are provided with packages of material to review in advance of the meeting, such that

the length and content of the meeting is made logical by informed prior review of the record. *See* supra, SOF, ¶ 64. Still further, a "custom" of rubber-stamping cannot logically be posited to exist based upon a single, after-the-shooting event.

**E. The City of Fall River's Custom of Tolerating Misconduct: The Michael Pessoa History[9]**

217. Officer Michael Pessoa served as a sworn Fall River Police Officer from January 2001 until his termination in January 2022. During his tenure, he was elevated to positions of authority and influence, serving as a Union Steward (beginning approximately 2007), Union Secretary (approximately 2013-2014), and a Field Training Officer (FTO) for 12 years (approximately 2007 until his suspension in 2019). [Cite: **Deposition of Michael Pessoa, Exhibit S** at 8-9, 12, 21-22].

**CITY'S RESPONSE:** Partially disputed. Pessoa was a Fall River police officer from 2001 until he was fired in 2022. His union roles, however, had nothing to do with the City as they were accomplished through union votes or assignments that do not involve the City in any fashion. *See* Pl. Exhibit S, Docket No. 278-21 at 12-18. Pessoa did serve as a field training officer but was removed from the role when allegations of wrongdoing in connection with the arrest of LaFrance, for which Pessoa later was charged and convicted criminally, came to light. *See* Pl. Exhibit S, Docket No. 278-21 at 23-25.

218. Officer Pessoa testified that he was well aware of the FRPD department policy authorizing the destruction of Internal Affairs (IA) records after five years, a policy he believed was in effect throughout his entire career, which actively prevented the preservation of pattern evidence of officer misconduct. [Cite: **Exhibit S** at 160-161].

**CITY'S RESPONSE:** Disputed, even beyond the improper argumentative nature of the representation. The plaintiffs failed to notice a Fed.R.Civ.P. 30 (b) (6) deposition and accordingly Pessoa spoke individually and not with the voice of the City at his deposition. Further, the representation is inaccurate as this very statement, with its record citations, documents investigatory and disciplinary events and material stretching back decades. *See* supra, SOF ¶¶ 18-20, 71-156.

219. In April 2006, during the arrest of 16-year-old Dennis Roque, Roque was beaten so severely that he suffered a lacerated spleen, vomited, and fainted in his jail cell. The City of Fall River subsequently settled Roque's civil lawsuit for $12,000 following a Grand Jury investigation. [Cite: **Exhibit S** at 38-40].

**CITY'S RESPONSE:** This statement is improperly supported by the record citation. There is no discussion on the pages cited to the settlement of a civil lawsuit for $12,000. Additionally, the reference to a grand jury is one, as revealed by the deposition transcript, that occurred years

---

9 **CITY'S RESPONSE:** To the extent that the section headings in the plaintiffs' additional statements are intended to be recitations of fact, they are not supported by citations to the summary judgment record and ought not be considered, including because they frequently are argumentative, conclusory and otherwise improper.

after the civil lawsuit and not, as stated by this statement, one that predated settlement of a civil claim.  *See* Pl. Exhibit S, Docket No. 278-21 at 39-41.  The City already presented information concerning this lawsuit within its statement.  *See supra*, SOF ¶ 139.

220. In March 2008, during the arrest of Candy Bosclair, Officer Pessoa delivered a "knee strike" to her rib area while she was on the ground, hospitalizing her with four broken ribs and a possible punctured lung. Pessoa admitted to breaking her ribs but claimed it was a "reasonable reactive response." [Cite: **Exhibit S** at 54-55].

**CITY'S RESPONSE:**  This statement is not entirely supported by the record citation.  The deposition transcript indicates only that, in 2008, Candy Bosclair was biting Pessoa and he delivered a knee strike that broke several ribs.  *See* Pl. Exhibit S, Docket No. 278-21 at 56-57.  There is no reference to a month, to her being on the ground, to hospitalization, to the number of broken ribs or to injury to a lung.

221. In January 2010, Officer Pessoa was investigated for using homophobic slurs toward a fellow disabled veteran officer (Nelson Souza) at St. Anne's Hospital. Pessoa admitted to stating a situation was "pretty gay" and ultimately signed a Negotiated Disciplinary Agreement for violating "Conduct Toward Associates" rules. [Cite: **Exhibit T** at 5-6; **Exhibit S** at 51].

**CITY'S RESPONSE:**  This paragraph is not properly supported by the record citations.  The citation to the Pessoa deposition transcript reveals that Pessoa was asked if he knew Nelson Souza, which he said that he did, and if he referred to Souza by a slur in front of police officers and hospital staff, which Pessoa denied.  *See* Pl. Exhibit S, Docket No. 278-21 at 52.  There is no other information about the allegation on the page.

Further, Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in an answer, the plaintiff makes assertions as to this incident without citation to the source of the information.  Affidavits at summary judgment are required, among other things, to be based upon personal knowledge.  *See* Fed.R.Civ.P. 56 (c) (4).  Interrogatory responses ought be treated no different and this statement therefore is not properly supported.

Responding still further, while the plaintiffs apparently do not agree with the response, this issue was addressed by the City.  *See supra* SOF, ¶ 132.

222. In February 2010, Officer Pessoa tackled Robert Dias face-first to the ground, resulting in Dias suffering two broken teeth and severe facial swelling. Pessoa testified that it was his standard practice to file police reports to retroactively justify the force used in cases that later resulted in lawsuits. [Cite: **Exhibit S** at 39-40].

**CITY'S RESPONSE:**  This statement is unsupported by the record citation.  There is no discussion of any event involving an individual named Dias on those pages of the transcript; *see* Pl. Exhibit S, Docket No. 278-21 at 41-42; and the word "Dias" does not appear in the word index of the deposition.  *See* Pl. Exhibit S, Docket No. 278-21 at 178.

223. In May 2012, police responded to a domestic dispute where Officer Pessoa allegedly

became enraged, threw his then-fiancée's (Officer Janis Bublinski) belongings, and called her a "fucking whore," resulting in a restraining order against him. He signed a Negotiated Disciplinary Agreement for "Conduct Unbecoming an Officer." [Cite: **Exhibit T** at 6; **Exhibit S** at 51-54].

**CITY'S RESPONSE:**  This statement is not entirely supported by the record citations.  In the deposition transcript, Pessoa testified that he was engaged to Janis Bublinski, that he screamed at her, that he threw some items and that she left.  *See* Pl. Exhibit S, Docket No. 278-21 at 53-56. He also testified that there was a restraining order issued.  *See* Pl. Exhibit S, Docket No. 278-21 at 53-56.

Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in an answer, the plaintiff makes assertions as to this incident without citation to the source of the information. Affidavits at summary judgment are required, among other things, to be based upon personal knowledge.  *See* Fed.R.Civ.P. 56 (c) (4).  Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported.

Further, in neither of the sources is there a reference to a police response to the incident or anything supporting the quotation in the paragraph that Pessoa called her a "fucking whore[.]"

224. In January 2014, Officer Pessoa used the Facebook account of his girlfriend (Raynham Officer Jennifer Pohl) to post a racist tirade calling attendees of a yacht party "dumb black thugs." He later confessed he accessed her computer "by accident" to make the post and accepted a 5-day unpaid suspension. [Cite: **Exhibit T** at 6; **Exhibit S** at 40-47, 49].

**CITY'S RESPONSE:**  This statement is not supported entirely by the record citations.  During his deposition, Pessoa confirmed that he made the post and, over the course of several pages, provided his opinion when asked about various professional basketball players, black and white. *See* Pl. Exhibit S, Docket No. 278-21 at 42-51.  Pessoa also indicated that he received a five-day suspension for the conduct.  *See* Pl. Exhibit S, Docket No. 278-21 at 51.

Exhibit T represents the interrogatory answers of a plaintiff in this matter and, in an answer, the plaintiff makes assertions as to this incident without citation to the source of the information. Affidavits at summary judgment are required, among other things, to be based upon personal knowledge.  *See* Fed.R.Civ.P. 56 (c) (4).  Interrogatory responses ought be treated no different and this exhibit therefore is not properly supported.

Further, during Pessoa's deposition he was asked if the suspension was purged from his file and he responded that he did not know.  *See* Pl. Exhibit S, Docket No. 278-21 at 49, 51).  Demonstrating the problem when a plaintiff makes a factual representation under oath without personal knowledge, Exhibit T represents that the record of suspension was purged.  *See* Pl. Exhibit T, Docket No. 278-22 at 7.  It was not.  *See* supra SOF, ¶ 133.

225. In October 2014, during an arrest, Officer Pessoa swept Carlos Roldan's legs and knocked him to the ground, causing a shattered tibia and complications that required a finger amputation. Pessoa pled guilty to excessive force and civil rights violations regarding this incident in

December 2023. [Cite: **Exhibit S** at 35].

**CITY'S RESPONSE:**  The representations in this statement are not supported by the record citation.  There is no discussion, at all, of Roldan on page thirty-five of the transcript which is page thirty-seven of the Pacer-supplied numbering.  From the word index, the word Roldan appears on three pages of the transcript.  *See* Pl. Exhibit S, Docket No. 278-21 at 188.  On those pages, Pessoa testified that he pled guilty to a 2014 assault of Roldan, that he filed a police report justifying his use of force in the interaction with Roldan and others, and that he was unaware of the resolution of the Roldan and other cases.  *See* Pl. Exhibit S, Docket No. 278-21 at 36, 41-42.  There is no reference in the record to the nature of what Pessoa was said to do to Roldan, Roldan's injuries, the nature of the criminal charges to which Pessoa pled guilty (other than an "assault") or when the plea occurred.

226. In October 2017, Kimberly Vieira filed a lawsuit alleging Officer Pessoa threatened, assaulted, and choked her after she recorded a police interaction on her phone. [Cite: **Exhibit S** at 36-38].

**CITY'S RESPONSE:**  This statement is not supported by the record citation.  On those pages of the deposition, Pessoa testified that he does not recall Vieira, could recall a lawsuit arising out of events in October, 2017 but did not recall it having to do with a recording or featuring accusations of assault or choking.  *See* Pl. Exhibit S, Docket No. 278-21 at 38-40.

227. In March 2018, Aliecer Rodriguez was beaten after recording an arrest. Officer Pessoa pled guilty in December 2023 to federal charges related to this retaliatory assault. [Cite: **Exhibit S** at 35].

**CITY'S RESPONSE:**  This statement is not supported by the record citation.  There is no mention of Rodriguez on that page of the transcript.  *See* Pl. Exhibit S, Docket No. 278-21 at 37.  According to the word index of the transcript, there is only one reference to Rodriguez in the transcript.  *See* Pl. Exhibit S, Docket No. 278-21 at 188.  That reference is to Pessoa admitting that he pled guilty to a 2018 assault of Alicia Rodriguez.  *See* Pl. Exhibit S, Docket No. 278-21 at 36.  There is no reference to a month, to the name "Aliecer" as compared to "Alicia[,]" that it involved a recording, that there was a plea to "federal charges" in December, 2023 or that any assault was "retaliatory[.]"

228. In February 2019, Officer Pessoa struck a handcuffed David Lafrance in the face unprovoked, knocking him to the ground. Despite video surveillance contradicting his official report, Pessoa was convicted by a jury in May 2023 of assault and battery with a dangerous weapon, witness intimidation, civil rights violations, and filing false reports. [Cite: **Exhibit T** at 36; **Exhibit S** at 30-34].

**CITY'S RESPONSE:**  The content of this statement is not supported by the record citations.  As to the Pessoa deposition, Pessoa's testimony was that he was convicted of filing false police report, sentenced to eighteen months to three years, served two years and was released in May, 2025, that he did not feel the video of the interaction contradicted his report and that he testified at the criminal trial.  *See* Docket No. 278-21 at 32-36.

60

As to Exhibit T, those are interrogatory responses from a plaintiff here and, in a response, that plaintiff alleges what David LaFrance would testify to, which was that LaFrance was punched in the face by Pessoa on February 12, 2019, LaFrance was charged falsely with six crimes and that Pessoa was convicted criminally for assault and false reporting. *See* Pl. Exhibit T, Docket No. 278-22 at 37.

Those citations do not support assertions that LaFrance was handcuffed, Pessoa's punch was unprovoked, that LaFrance was knocked to the ground or that Pessoa's criminal charges went beyond assault and false reporting. Further, as indicated earlier in this statement, this allegations made by LaFrance were investigated and, in addition to Pessoa's criminal charges, he was fired based upon the allegations. *See* supra, SOF, ¶ 140; *see also* City Attachment U, Docket No. 261-22 at 203-267.

229. In March 2019, during booking, Officer Pessoa slammed Luke Raffa's head onto a counter, causing a concussion. Similar to the false charges levied against the Ruiz family, Pessoa filed a report under the pains and penalties of perjury falsely claiming Raffa spat in his face—a lie disproven by booking video and fellow officer testimony. [Cite: **Exhibit T** at 37; **Exhibit S** at 35-37].

**CITY'S RESPONSE:** In addition to being argumentative, the content of this statement is not supported by the record citations. In the Pessoa transcript, Pessoa testified that he did not state in his report that he slammed Raffa's head on a counter after Raffa spit on him and that the video was unclear about spitting but that it did occur. *See* Pl. Exhibit S, Docket No. 278-21 at 37-38.

With respect to Exhibit T, those are interrogatory responses from a plaintiff here and, in a response, that plaintiff alleges what Robert Jacob would testify to—namely, that he witnessed Pessoa's assault and saw no spitting. *See* Pl. Exhibit T, Docket No. 278-22 at 37.

Those citations do not support that Pessoa slammed Raffa's head on a counter, caused a concussion or that a report was signed under the pains and penalties of perjury.

Responding further, after this allegation was made, which postdates the incidents at issue here and occurred in 2019, Pessoa was investigated for his force on Raffa and was fired by the City based in part on those allegations. *See* City Attachment U, Docket No. 261-22 at 203-267.

230. As a result of this systemic and documented pattern of violence and false reporting, Officer Pessoa was sentenced to 18 months to three years in prison, ultimately serving approximately two years before his release on May 12, 2025. Dr. Kirkham concluded that allowing an officer with this history to serve as a Field Training Officer for over a decade demonstrated a custom, policy, and practice of deliberate indifference by the City of Fall River. [Cite: **Exhibit S** at 31-33; **Exhibit X at 4-9**].

**CITY'S RESPONSE:** Although this paragraph is impermissibly argumentative, with the assertions of counsel going beyond what the record cited supports, it is admitted that Pessoa was convicted and sentenced to eighteen months to three years and that he served two years before a release in May, 2025. *See* City Response to SOF, ¶ 217. As to the expert report, the opinion

61

cannot be supported given that the LaFrance and Raffa events not only postdated 2017 but, far from a custom, policy or practice of deliberate indifference, Pessoa was fired for them. *See* City Attachment U, Docket No. 261-22 at 203-267.

**F. The Federal Conviction of Nicholas Hoar and Monell Ratification[10]**

231. Despite Officer Hoar's claim that the Acura moved and "swept" him onto the hood, he is the only witness to make this assertion. Backup Officer Allen Correiro testified during his 2023 deposition, repeating exactly what he told police investigators on November 16, 2017, that he did not see how Officer Hoar got onto the hood of the Acura. [Cite: **Docket No. 268-4** at 28-30; **Exhibit J** at 27].

**CITY'S RESPONSE:** Disputed. Correiro told Massachusetts State Police investigators that, after his arrival, he saw the Ruiz-Barreto vehicle back up, to the point that he thought it would strike a vehicle behind it, and then move forward, at which point Correiro observed Hoar on the hood of the Acura. *See* City Attachment E, Docket No. 261-5 at 9. Further, prior to a recanting years later, Eusebio Famania told State Police investigators that the Acura began going forward in what he perceived to be an attempt to push the officer away, after which the officer was leaning on the hood and Ruiz-Barreto then "hit the gas." *See* City Attachment E, Docket No. 261-5 at 11. Although Famania recanted that statement years later, at the time of the operative events here, Famania's first version of what occurred was his only version.

232. During his May 30, 2024 deposition, Officer Hoar admitted to walking right up to the A-pillar of the Acura and banging his firearm on the windshield, a blatant violation of unknown risk and felony stop protocols that directly instigated the deadly encounter. [Cite: **Deposition of Nicholas Hoar, Exhibit L** at 135].

**CITY'S RESPONSE:** The content of this statement is not supported by the record citation. On this page of the deposition transcript, Hoar testified that, once on the hood of the vehicle, he was screaming for the driver to shut the vehicle off while banging the windshield with the front of his gun. *See* Pl. Exhibit L, Docket No. 278-14 at 137. There is nothing on the page that describes Hoar approaching the A-pillar of the car or banging a firearm on the windshield prior to Hoar being on the hood of the car, nor is there anything in the cited page that would support the argumentative and improper representation that such conduct was "a blatant violation of unknown risk and felony stop protocols that directly instigated the deadly encounter." To the contrary, this page reveals that Hoar was striking the windshield and screaming for the driver to stop after he was on the hood of the car.

233. Following the fatal shooting of Larry Ruiz-Barreto in November 2017, the City of Fall River and Chief Dupere failed to discipline Officer Hoar or mandate any remedial training. Instead, they returned him to full duty, after which Hoar accumulated an astonishing 28

---

10 **CITY'S RESPONSE:** To the extent that the section headings in the plaintiffs' additional statements are intended to be recitations of fact, they are not supported by citations to the summary judgment record and ought not be considered, including because they frequently are argumentative, conclusory and otherwise improper.

additional use-of-force filings. [Cite: **Exhibit X at 4-9**].

**CITY'S RESPONSE:**  As to the first sentence, it is admitted that Hoar was not disciplined or directed to undergo remedial retraining.  After the Massachusetts State Police investigation, the District Attorney concluded that Hoar's use of deadly force was justified in the circumstances that he faced.  *See* supra, SOF, ¶ 46.  Following the District Attorney's determination informed by the State Police investigation, a shooting investigation team performed an inquiry, determining that there were no procedural violations by Hoar and that determination was endorsed by the shooting review board, which determination then was accepted by Dupere after review.  *See* supra, SOF, ¶¶ 58-70.

As to the second sentence, the statement is not supported by the record citation.  The Kirkham report references twenty-eight post-shooting reports, with no description of the nature of any such report.  Further, while Fed.R.Civ.P. 26 (a) (2) (B) requires that a proffered expert submit a report disclosing the sources of any opinions, the Kirkham report does not state any source that contains any information about a supposed twenty-eight use-of-force filings.  *See* Pl. Exhibit U, Docket No. 278-26 at 3-4.  For example, Kirkham says that he reviewed Hoar's deposition transcript, but there is no such reference in that transcript to such a claim.  *See* Pl. Exhibit U, Docket No. 278-26 at 3-4; *see also* Pl. Exhibit L, Docket No. 278-14.

234. This unbroken, City-ratified pattern of unchecked excessive force culminated on December 21, 2020, when Officer Hoar assaulted an arrestee (W.H.) by striking him in the head with a baton, requiring five stitches to close the wound, and subsequently filing false police reports to cover up the abuse. [Cite: **Federal Indictment, 1:22-cr-10324-ADB**, ECF No. 1].

**CITY'S RESPONSE:**  The content of this statement is impermissibly argumentative with regard to the claim of an "unbroken, City-ratified pattern of unchecked excessive force[,]" something that is not supported by the record citation in any event.  Responding further, it is admitted that Hoar, years after the shooting in this matter, was charged federally with excessive force and false reporting.

235. On November 29, 2022, Officer Hoar was federally indicted on one count of Deprivation of Rights Under Color of Law (18 U.S.C. § 242) and two counts of False Reports (18 U.S.C. § 1519). Following a trial, a federal jury convicted Officer Hoar on all counts on February 1, 2024. [Cite: **Docket Sheet, 1:22-cr-10324-ADB**].

**CITY'S RESPONSE:**  Admitted, with an affirmative additional response that the indictment and the underlying conduct occurred years after the 2017 shooting.

236. On May 22, 2024, Officer Hoar was sentenced by U.S. District Judge Allison D. Burroughs to 33 months in federal prison followed by one year of supervised release. Dr. Kirkham cited Hoar's federal conviction for excessive force and false reporting—the exact same behaviors alleged in the 2017 fatal shooting of Larry Ruiz-Barreto—as further evidence of the City of Fall River's custom of deliberate indifference and systemic failure to discipline officers. [Cite: **Docket Sheet, 1:22-cr-10324-ADB**, ECF No. 133].

**CITY'S RESPONSE:**  It is admitted that Hoar was convicted federally and sentenced.  As to the second sentence of this paragraph, it need not be considered because, in addition to not being a supportable fact for purposes of summary judgment, the sole citation in this paragraph is to the docket sheet in the federal case and there is no citation to anything else in the summary judgment record.

Respectfully submitted,

**THE PLAINTIFFS,**

By their attorney,

*/s/ C. Samuel Sutter*
C. Samuel Sutter, BBO# 542496
Law Offices of Ronald J. Resmini
34 Borden Street
Fall River, MA 02721
(774) 488-4944
Css8311910@yahoo.com


DEFENDANTS CITY OF FALL RIVER
AND ALBERT DUPERE,
By their attorney,

/s/ Andrew J. Gambaccini
Andrew J. Gambaccini, BBO #:  654690
Vigliotti, Gambaccini & Akerson, P.C.
4 Lancaster Terrace
Worcester, MA 01609
508.686.7285
agambaccini@vgalawpc.com